UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
EMA FINANCIAL, LLC,

        Plaintiff, Counterclaim
        Defendant,        **MEMORANDUM AND ORDER**

    - against -        18 Civ. 3634 (NRB)

NFUSZ, INC.,

        Defendant, Counterclaim
        Plaintiff.
-----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This litigation, between lender EMA Financial, LLC ("EMA" or "plaintiff") and borrower NFusz, Inc. ("NFusz" or "defendant"), concerns two substantially similar transactions whereby plaintiff provided defendant with cash in exchange for (1) a one-year note bearing interest convertible into shares of NFusz common stock and (2) a warrant agreement granting plaintiff a five-year option to purchase shares of NFusz common stock at a fixed price (the "exercise price").[1]  Both transactions consist of a Securities

---

[1] This action is the latest in a litany of recent cases brought in this District and the Eastern District of New York involving alleged breaches of convertible promissory notes and related agreements in which corporate defendants rely principally on a criminal usury defense.  See EMA Fin., LLC v. AIM Expl., Inc., No. 18 Civ. 145 (ER), 2019 WL 689237, at *1 n.1 (S.D.N.Y. Feb. 19, 2019) (collecting cases).  But whereas the recent slew of cases have centered primarily on the issue of whether, in considering a loan's effective interest rate, courts are to include the potential profit a lender stands to gain by electing to obtain principal repayment in the form of the borrower's common stock shares rather than cash, the instant dispute centers on a distinct transaction feature -- namely, a lender's entitlement to common stock warrants that are received *in addition to* (rather than *in lieu of*) principal repayment.

Purchase Agreement (the "SPAs"), a Convertible Promissory Note (the "Notes"), and a Stock Purchase Warrant (the "Warrant Agreements"), (collectively, the "Agreements").[2]

In April 2018, after NFusz had repaid the Notes in full, EMA initiated this action to enforce its right to certain shares of NFusz common stock pursuant to the "cashless exercise" procedure as set forth in the Warrant Agreements. EMA now moves for partial summary judgment seeking a declaration regarding the validity of the formula pursuant to which EMA's entitlement to NFusz common stock is calculated, and dismissal of defendant's affirmative defenses and counterclaims. Defendant cross-moves for summary judgment on the grounds that the transactions are usurious and thus void ab initio under New York law. In the alternative, defendant seeks rescission of the Warrant Agreements or reformation of the cashless exercise formulas therein.

For the reasons that follow, the Court grants EMA's motion for partial summary judgment as to NFusz's usury defense, but denies EMA's motion insofar as it seeks a declaration regarding the cashless exercise formula as written in the Warrant

---

[2] For the sake of clarity, the Court notes that each Warrant Agreement grants to EMA a certain number of warrant shares that, in turn, may be used to purchase shares of NFusz common stock. Thus, "warrant shares" do not represent immediate ownership of NFusz common stock but merely the option to purchase shares of NFusz common stock at a fixed price in the future.

Agreements.[3]  Indeed, notwithstanding the plain terms of the cashless exercise formula, the Agreements read in their entirety reveal that NFusz's position regarding the proper cashless exercise formula is the only sensible one and that the cashless exercise formula must be enforced accordingly.

I.  **Background**[4]

EMA is a Delaware limited liability company with a principal office in New York City.  ECF No. 65 ¶¶ 3, 4.  NFusz, now known as Verb Technology Company, Inc., is a Nevada corporation headquartered in Los Angeles.  Id.  When EMA initiated this lawsuit, NFusz's shares traded on the OTCQB market under the symbol "FUSZ."  See ECF No. 51-7.

On December 5, 2017, the parties entered into an SPA (the "December SPA") pursuant to which NFusz issued to EMA: (1) an 8%

---

[3] EMA's motion is one for partial summary judgment because it seeks judgment only as to its fourth cause of action for declaratory relief.  See ECF No. 4 ¶¶ 27-29.  EMA's first three purported causes of action are styled as follows:  Failure to Deliver Shares – Relief Sought: Money Damages (Claim 1); Failure to Deliver Shares – Relief Sought: Preliminary and Permanent Injunction (Claim 2); Failure to Deliver Shares – Relief Sought: Liquidated Damages (Claim 3).  ECF No. 4 ¶¶ 19-26.

[4] The following facts are drawn from Plaintiff's Local Civil Rule 56.1 Statement of Undisputed Material Facts (ECF No. 59); the Declaration of Thomas J. Fleming in Support of EMA's Motion for Partial Summary Judgment and the exhibits annexed thereto (ECF No. 61); the Declaration of Felicia Preston in Support of EMA's Motion for Partial Summary Judgment (ECF No. 64); Defendant NFusz's Rule 56.1 Statement of Material Facts Not in Dispute (ECF No. 65); the Affirmation of Marjorie Santelli in Support of NFusz's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 67); and the Declaration of Felicia Preston in Support of EMA's Opposition to NFusz's Motion for Preliminary Injunction and Cross-Motion for Preliminary Injunction (ECF No. 41).

convertible note in the original principal amount of $185,000 (the "December Note"); and (2) 1,200,000 warrant shares for NFusz common stock (the "December Warrant"), exercisable at $0.11 per warrant share. ECF No. 74 ¶ 23. On January 11, 2018, the parties entered into a substantially similar SPA (the "January SPA") whereby NFusz issued to EMA an 8% convertible note in the original principal amount of $75,000 (the "January Note");[5] and (ii) 500,000 warrant shares for NFusz common stock (the "January Warrant"), exercisable at $0.14 per warrant share.[6] Id. ¶ 25. While the December and January transactions were being negotiated, both parties participated in calls with representatives of a fund called Auctus Fund Management, LLC ("Auctus"). ECF No. 70 ¶¶ 13, 22. NFusz and Auctus entered into two separate, similarly structured transactions whereby Auctus provided NFusz with cash in exchange for convertible notes and warrant shares.

On March 12, 2018, NFusz repaid both the December and January Notes in full, in the amounts of $225,811.51 and $87,121.23,

---

[5] EMA retained 10% of the $185,000 and $75,000 loaned to NFusz (the "Original Issue Discount"), such that NFusz only received $166,500 and $67,500, respectively. See ECF No. 74 ¶ 20.

[6] On December 5, 2017, defendant's common stock closed at $0.096 ($0.014 less than the exercise price of $0.11). On January 11, 2018, defendant's common stock closed at $0.097 ($0.043 less than the strike price of $0.14). See ECF No. 70 at 3; ECF No. 59 at 8. The warrant shares were thus "out of the money" at issuance (i.e., they would have been economically detrimental to exercise).

respectively.[7]  ECF No. 59 ¶ 28.  At that time, EMA had not yet attempted to exercise any of the warrant shares underlying the December and January Warrant Agreements, which were set to expire in December 2022 and January 2023, respectively.

The procedure for exercising the warrant shares requires EMA to deliver to NFusz an executed version of the Notice of Exercise Form that is annexed to the Warrant Agreements.  <u>See</u> ECF No. 67-3 at 2.  The Notice of Exercise form, in turn, requires EMA to designate whether payment for the common stock shares will be made "in lawful money of the United States" (i.e., with cash or cash equivalents), or pursuant to the cashless exercise procedure as set forth in the Warrant Agreements.  <u>Id.</u> at 12.

The cashless exercise mechanism, which is at the center of this dispute, is described in identical provisions of the Warrant Agreements as follows:

> c) <u>Cashless Exercise</u>.  In the event that the shares underlying this Warrant are not registered for resale with the Securities and Exchange Commission under an effective registration statement with a current prospectus, then this Warrant may also be exercised by means of a "cashless exercise" in which the Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B)(X)] by (B), where:
>
> (A) = the Market Price (as defined below)
>
> (B) = the Exercise Price of this Warrant (as adjusted); and

---

[7] While the terms of the Notes gave EMA the right to convert the principal outstanding on the Notes into NFusz common stock in lieu of cash repayment, EMA never sought to exercise that right.  <u>See</u> ECF No. 41-2 at 3.

(X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.

"Market Price" shall mean the closing sale price per share of Common Stock on the principal market where the Common Stock is traded on the Trading Day immediately preceding delivery of the Notice of Exercise or the Closing Date, whichever is greater. Notwithstanding anything herein to the contrary, on the Termination Date, this Warrant shall be automatically exercised via cashless exercise pursuant to this Section 2(c).

Id. at 3.

The Notice of Exercise Form further describes the cashless exercise procedure as "the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c)." Id. at 12. Stated simply, if at the time EMA seeks to exercise its warrant shares the NFusz common stock underlying those shares have not been registered for resale with the SEC, EMA has the option to pay NFusz for the common stock shares via the "cancellation" of warrant shares instead of with a cash payment.

On March 28, 2018, EMA delivered to NFusz a Notice of Exercise form indicating its intent to exercise, on a cashless basis, 500,000 of the 1.2 million warrant shares underlying the December

Warrant Agreement (the "March Exercise Notice").[8]  See ECF No. 67-8 at 2.  At the time EMA sought to exercise the 500,000 warrant shares, NFusz common stock was trading at $1.71 and the exercise price under the December Warrant Agreement remained $0.11. Applying the $1.71 market price and the $0.11 exercise price to the cashless exercise formula as written in the December Warrant Agreement, EMA calculated that it was entitled 7,272,727 shares of NFusz common stock.[9]  In response to the March Exercise Notice, NFusz informed EMA that the cashless exercise formula as written in the December Warrant Agreement was clearly an error and that NFusz would not permit its transfer agent to deliver the requested number of shares.  See ECF No. 67-9.  According to NFusz, the cashless exercise formula has no sensible application unless the denominator reflects the market price, rather than the exercise price, thus entitling EMA to 467,836 shares of NFusz common stock using the agreed upon inputs.

For ease of comparison, the formulas that each party maintains are correct are set forth below, along with the number of common

---

[8] The parties do not dispute that when EMA delivered its Notice of Exercise on March 28, 2018, NFusz common stock was "not registered for resale with the Securities and Exchange Commission under an effective registration statement with a current prospectus" pursuant to Section 2(c) of the December Warrant. Accordingly, plaintiff had the right to a cashless exercise.

[9] EMA arrived at the 7,272,727 figure using the formula as written in the Warrant Agreements:  ($1.71-$0.11)(500,000)/($0.11) = 7,272,727 common stock shares.

stock shares each formula yields when calculated using the agreed upon variables.

| EMA's Formula | NFusz's Formula |
|:---:|:---:|
| $$\frac{(A-B)(X)}{B}$$ | $$\frac{(A-B)(X)}{A}$$ |
| $$\frac{(\$1.71-\$0.11)(500,000)}{\$0.11}$$ | $$\frac{(\$1.71-\$0.11)(500,000)}{\$1.71}$$ |
| **= 7,272,727.27 shares** | **= 467,836.257 shares** |

As shown, EMA and NFusz agree that the numerator of the cashless exercise formula should reflect the exercise price ("B") subtracted from the market price ("A"), multiplied by the number of warrant shares being exercised ("X").[10] The parties' formulas diverge in that EMA would, consistent with the formula as written in the Warrant Agreements, divide the numerator value by the *exercise price* (here, $0.11), whereas NFusz maintains the numerator should be divided by the *market price* (here, $1.71).

---

[10] Conceptually, subtracting the exercise price ($0.11) from the market price ($1.71) yields the profit that EMA stood to gain per share (assuming, that is, that the common stock share could immediately be sold at the $1.71 market price). Multiplying the profit per share by the number of warrant shares being exercised (which both formulas contemplate) thus yields the total potential profits associated with a particular exercise. Stated otherwise, under both formulas, the numerator represents the product of multiplying the profits per warrant share (here, $1.71 - $0.11, or $1.60), by the number of warrant shares being exercised (here, 500,000), totaling $800,000.

The parties do not dispute that inputting the $0.11 exercise price and $1.71 market price into their respective formulas entitles EMA to 7,272,727 and 467,836 common stock shares, respectively, upon a cashless exercise of 500,000 warrant shares.

Several other provisions of the Agreements are relevant to this dispute:

- **Choice-of-law:** The SPAs and Notes contain identical provisions that provide for the application of Nevada law. Section 9(a) of the SPAs state, in relevant part, that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws." ECF Nos. 41-1; 41-6. Similarly, ¶ 4.6 of the Notes state that "[t]his Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction." ECF Nos. 41-2; 41-7. The Governing Law provisions of the SPAs are incorporated by reference into the Warrants, which state that "[a]ll questions concerning the validity, enforcement, and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement." December Warrant Section 5(e); January Warrant Section 5(e). See Def.'s Mem. of Law in Supp. Summ. J. at 25 (ECF No. 60).

- **Usury Waiver:** Section 10(e) of both SPAs state, "[t]o the extent it may lawfully do so, the Company [i.e., NFusz] hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any claim, action or proceeding that may be brought by the Purchaser in order to enforce any right or remedy under the Note." ECF No. 41-1.

## II. Procedural History

On April 24, 2018, EMA filed the operative complaint, seeking monetary and injunctive relief for breach of the December Warrant

Agreement and a declaration that the March Exercise Notice was valid and correctly applied the cashless exercise formula.[11] In its answer, NFusz alleged counterclaims for fraud in the inducement, reformation or rescission on the basis of mistake, and sought the recovery of "all amounts previously paid under the notes representing overcharges of interest" and the voiding of the two transactions pursuant to its affirmative defense of criminal usury. See ECF No. 19.[12]

On December 20, 2018, while discovery was ongoing, EMA attempted, once again, to gain delivery of the requested 7,272,727 shares of NFusz common stock pursuant to the disputed cashless exercise formula. This prompted NFusz to file a proposed Order to Show Cause seeking a preliminary injunction and a temporary restraining order ("TRO") to enjoin plaintiff from attempting to

---

[11] In a May 24, 2018 letter to the Court concerning a proposed motion to dismiss, NFusz advanced substantially the same arguments that it advances here -- namely, that New York rather than Nevada law should govern the transactions and that the transactions violated New York's criminal usury laws. See ECF No. 11. EMA argued in response that Nevada law should apply and that even if the Court applied New York law, the transactions still would not be criminally usurious. See ECF No. 13. In a June 18, 2018 letter to the parties, the Court expressed skepticism that the Nevada choice-of-law provisions in the Agreements should not apply and questioned whether the transactions at issue would even be subject to a usury analysis given that the securities involved certain equity-like characteristics. See ECF No. 14.

[12] Because NFusz did not make any arguments in opposition to EMA's partial motion for summary judgment as to NFusz's counterclaim for fraud-in-the inducement, see ECF No. 19 at 16, 17, that claim has been abandoned. See Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

exercise the Warrant Agreements pending resolution of this proceeding.[13] During a teleconference with the Court held on January 16, 2019, the Court proposed a compromise whereby plaintiff would receive the 467,836 common stock shares to which defendant had previously conceded the plaintiff was entitled, without prejudice to plaintiff's ability to receive a larger number of shares at a later time. During a subsequent teleconference held on January 18, 2019, defendant rejected this proposal based on its contention that the transactions were void *ab initio* pursuant to New York's criminal usury laws.

On February 1, 2019, following the close of discovery, plaintiff filed an opposition to defendant's motion for a preliminary injunction and cross-moved for a preliminary injunction seeking a declaration concerning the validity of the Warrant Agreements and an order directing defendant to immediately deliver at least 467,836 shares of common stock pursuant to the formula advanced by defendant. ECF No. 40 at 19. On May 30, 2019, following oral argument on the parties' preliminary injunction motions, the Court granted the parties leave to brief cross-motions for summary judgment. To date, NFusz has not delivered any shares to EMA.

---

[13] The Court denied the TRO on the grounds that the defendant could simply instruct its transfer agent to refuse to honor EMA's requests, as defendant had done previously.

EMA now moves for partial summary judgment, under Federal Rule of Civil Procedure 56, seeking a declaration that the March Exercise Notice "was valid and correctly applied the cashless exercise formula in the Warrants." ECF No. 60 at 17. NFusz cross-moves for summary judgment on its affirmative defense of usury or, should the Court determine that Nevada law applies and that its usury defense is unavailable, rescission of the Warrant Agreements or reformation of the cashless exercise formula on the basis of unilateral mistake. See ECF No. 66 at 9. Oral argument on the parties' cross-motions was held on December 5, 2019.

## III. **Discussion**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted) (quoting Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)). A factual dispute is genuine if a reasonable factfinder could decide in the nonmoving party's favor. Id.

At summary judgment, a court must resolve all ambiguities and draw all justifiable inferences in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The

moving party must "make a prima facie showing that it is entitled to summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). If it does so, then there is no issue for trial unless the party opposing summary judgment presents "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "The same standard . . . applies when," as here, "the court is faced with cross-motions for summary judgment. Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration." Bell v. Pham, No. 09 Civ. 1699 (PAC), 2011 WL 1142857, at *2 (S.D.N.Y. Mar. 24, 2011) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

This Memorandum and Order proceeds as follows. The Court first addresses NFusz's usury defense, which requires a threshold inquiry into whether the Agreements are governed by New York or Nevada law. After concluding that the parties' Nevada choice-of-law provisions control and that NFusz's usury defense therefore fails as a matter of law, the Court turns to an analysis of the disputed cashless exercise formula. Because that analysis reveals not only that the formula as written cannot be reconciled with other provisions of the Agreements but also that NFusz's position as to the correct formula is the only commercially reasonable one, the Court exercises its authority, pursuant to Rule 56(f)(1) of

the Federal Rules of Civil Procedure, to issue a declaratory judgment in NFusz's favor on the issue of the cashless exercise formula's proper interpretation.[14]  Accordingly, the Warrant Agreement is reformed to reflect the only logical and appropriate reading of the cashless exercise formula therein.

## A.   Usury

Plaintiff moves for partial summary judgment dismissing defendant's affirmative usury defense on the grounds that it is unavailable under the parties' selected law (i.e., Nevada). See Consumers Distrib. Co. v. Hermann, 812 P.2d 1274, 1278 (Nev. 1991) ("Nevada has no statute which precludes high interest rates.") Indeed, under Nevada law, parties to a contract:

> may agree for the payment of any rate of interest on money due or to become due on any contract, for the compounding of interest if they choose, and for any other charges or fees. The parties shall specify in writing the rate upon which they agree, that interest is to be compounded if so agreed, and any other charges or fees to which they have agreed.

NRS 99.050.

---

[14] At the outset of oral argument, this Court raised the possibility of invoking Rule 56(f)(1).  Specifically, the Court asked the following question:

> The briefing on these various cross motions presents a number of merits issues for resolution.  Given that there's been discovery, and that you've had a full opportunity to brief these merit issues, is there any structural reason that I cannot reach and rule on the merits of the various arguments irrespective of whether they are in the context of a motion by the plaintiff directed to an affirmative defense raised by the defendant or a motion by the defendant addressed to the plaintiff's complaint?

ECF No. 77 at 2.  Neither counsel had any objection.

Defendant maintains that, notwithstanding the choice-of-law provisions in the Agreements, New York law should apply because the parties and the transaction lack the requisite nexus to Nevada law and that, in any event, applying Nevada law would violate New York's fundamental public policy against usury.

For the following reasons, the Court concludes that the parties' choice-of-law provision must be enforced, and thus that NFusz's usury defense fails as a matter of law.[15]

### 1. Choice of Law

A federal court sitting in diversity applies the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941). Where, as here, the contracts at issue contain choice-of-law clauses, the Court applies New York's choice-of-law rules "to determine whether and to what extent the parties' contractual choice should be honored." Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir. 1987).

"Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction." Welsbach Elec. Corp. v. MasTec N. Am., Inc., 859 N.E.2d 498, 500 (N.Y. 2006). "New York courts may refuse to enforce a choice-of-law clause only where (1) the

---

[15] The parties do not dispute that NFusz's usury defense fails to the extent Nevada law applies.

parties' choice has no reasonable basis or (2) application of the chosen law would violate a fundamental public policy of another jurisdiction with materially greater interests in the dispute." Beatie & Osborn LLP v. Patriot Sci. Corp., 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006). New York courts typically apply the law selected in contractual choice-of-law clauses only to causes of action sounding in contract unless "the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." H.S.W. Enter., Inc. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 141 (S.D.N.Y. 2001). "Under New York law, the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved; if no conflict exists, then the inquiry ends." Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223 (1993).

Here, a meaningful conflict exists between Nevada law, which does not permit corporations to raise a criminal usury defense, and New York law, which does. Compare NRS 99.050 (permitting contracting parties to agree upon any rate of interest), with N.Y. Gen. Oblig. Law § 5-521(3) (permitting corporations to raise

criminal usury as a defense in litigation).[16]  Accordingly, for the
Court to set aside the parties' choice of Nevada law, NFusz must
show either that Nevada is not "reasonably related" to the parties
or the transaction or that applying Nevada law would offend a
fundamental public policy of the state of New York.  Beatie, 431
F. Supp. 2d at 378.

### a)  Reasonable Relationship

Defendant    maintains    that    Nevada    lacks    the    requisite
"reasonable  relationship"  to  the  parties  or  the  transaction
because "the only relationship between the parties, the contract,
and the state of Nevada is that one of the parties (NFusz) was
incorporated there."  ECF No. 66 at 17.  To the contrary, courts
in this Circuit have deemed one party's incorporation in the state
of  the  parties'  chosen  law  sufficient  for  purposes  of  the
"reasonable relationship" test.  See, e.g., Power Up Lending Grp.,
Ltd. v. All. Bioenergy Plus, Inc., 2019 WL 1322621, at *4 (E.D.N.Y.
Feb. 28, 2019), report and recommendation adopted, 2019 WL 1317456
(E.D.N.Y. Mar. 22, 2019) ("[B]ecause Plaintiff is incorporated in
Virginia, and the parties entered into two separate transactions,
totaling  four  separate  signed  agreements,  all  stating  that

---

[16] Under New York law, a loan is criminally usurious when the interest
rate exceeds 25% per annum or the equivalent rate for a longer or shorter
period.  See N.Y. Penal Law § 190.40.  While New York's civil usury statute
prohibits charging interest on a "loan or forbearance" at a rate that exceeds
16% annually, see N.Y. Gen. Oblig. Law § 5-521(1), corporations are barred from
asserting civil usury as an affirmative defense.

Virginia law governs, this Court concludes that Virginia bears a reasonable relationship to the transactions."); Power Up Lending Grp., Ltd v. Danco Painting, LLC, 2016 WL 5362558, at *4 (E.D.N.Y. Aug. 10, 2016) ("As Plaintiff is a Virginia corporation and the parties agreed to apply the state's laws, the Court finds sufficient contacts with the state of Virginia.").[17]

Defendant notes correctly that the parties and the transaction have multiple contacts with the state of New York. Among them, EMA's principal place of business is in New York, the Agreements were drafted in New York, and "EMA required that the original signed documents be received by its New York offices for the Agreements to be effective." ECF No. 66 at 16; ECF No. 68 at 12. The relevant inquiry is not, however, whether the selected state is the state with the greatest number of connections to the parties or the transaction; rather, it is whether the relationship to the selected state is "reasonable." See Madden v. Midland Funding, LLC, 237 F. Supp. 3d 130, 148 n.7 (S.D.N.Y. 2017) ("Several federal court decisions appear to rely on an outdated

---

[17] These rulings are consistent with the approach set forth in the Restatement (Second) of Conflict of Laws, which states that "parties will be held to have had a reasonable basis for their choice [of law] when [the chosen state] is that where performance by one of the parties is to take place or *where one of the parties is domiciled* or has his principal place of business." Section 187 cmt. f (1971) (emphasis added). In determining whether to apply choice-of-law clauses, New York courts follow the Restatement's approach. See S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1025 (S.D.N.Y. 1984) (describing New York's approach to contractual choice-of-law clauses as being "stated succinctly" in the Restatement (Second) of Conflict of Laws § 187).

standard allowing courts to avoid parties' choice of law when the 'most significant contacts' occur in another forum"); see also Finucane v. Interior Const. Corp., 695 N.Y.S.2d 322, 325 (N.Y. 1999) (upholding the parties' contractual choice-of-law notwithstanding the possibility that the state of New York "ha[d] a greater interest in the litigation" than the state whose laws the parties agreed would govern).

The cases NFusz cites do not compel a different result. NFusz relies primarily on Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc., 2019 WL 1473090, at *4 (E.D.N.Y. Apr. 3, 2019) -- a case defendant describes as having "facts nearly identical to those presented here," id. at 17 -- in support of its contention that "where the sole connection is that one of the parties was incorporated in the state of the chosen law, New York courts are unlikely to find a 'reasonable relationship.'" Id. In Power Up, however, it was the lender, rather than the borrower, that was incorporated in the state of the parties' chosen law. Accordingly, the borrower's affirmative defense of usury did not, as here, hinge upon avoiding the laws of its own state of incorporation. While not dispositive to its analysis, the Court regards with some skepticism the arguments made by a Nevada corporation that the laws of its state of incorporation should not apply. This is particularly true where, as here, six different agreements negotiated between the parties at arms-length either expressly

contemplate that Nevada law is to govern or incorporate the Nevada choice-of-law clause by reference. <u>See</u> ECF No. 67.

Because the Court cannot conclude that Nevada bears no "reasonable relationship" to the parties and the transaction such that the parties' contractual choice-of-law should be set aside, the Court turns to the question of whether applying Nevada law would violate a fundamental public policy of New York.

**b)  Public Policy**

"[T]he party opposing enforcement of a contractual choice of law . . . bears a 'heavy burden' of demonstrating that the foreign law is offensive to [New York's] public policy." <u>Finucane</u>, 695 N.Y.S.2d at 325 (citing <u>Cooney v. Osgood Mach., Inc.</u>, 612 N.E.2d 277, 285 (N.Y. 1993)). "'The public policy doctrine is an exception to implementing an otherwise applicable choice of law in which the forum refuses to apply a portion of foreign law because it is contrary or repugnant to its State's own public policy.'" <u>Galeotti v. Cianbro Corp.</u>, 2013 WL 3207312, at *16 (N.D.N.Y. June 24, 2013) (quoting <u>Schultz v. Boy Scouts of Am., Inc.</u>, 480 N.E.2d 679, 687 (N.Y. 1985)). The exception "should only be used in instances in which the laws of the foreign state are 'truly obnoxious'" to the public policy of the forum state. <u>Id.</u> (quoting <u>Edwards v. Erie Coach Lines Co.</u>, 952 N.E.2d 1033, 1041 (N.Y. 2011)); <u>see</u> <u>also</u> <u>Boss v. Am. Exp. Fin. Advisors, Inc.</u>, 791 N.Y.S.2d 12, 14 (N.Y. 2005), <u>aff'd sub nom. Boss v. Am. Express Fin.</u>

Advisors, Inc., 844 N.E.2d 1142 (N.Y. 2006) (noting that a court should only refuse to enforce a choice-of-law provision on public-policy grounds if its enforcement "would result in [the] approval of [a] transaction that is inherently vicious, wicked or immoral, and shocking to prevailing moral senses"). The public policy exception only applies "when New York's nexus with the case is substantial enough to threaten our public policy." Cooney, 612 N.E.2d at 284.

The New York Court of Appeals has offered several examples of policies so fundamental to New York law that it would warrant overriding the parties' choice-of-law in order to ensure their enforcement. In Welsbach, for example, the Court cited anti-discrimination and human rights laws as sufficiently fundamental to defeat contracting parties' choice-of-law. 859 N.E.2d at 501. The public policy implicated here -- prohibiting usurious transactions negotiated at arms-length by sophisticated entities -- is not similarly fundamental. Indeed, statutes prohibiting usurious loans were enacted "to protect desperately poor people from the consequences of their own desperation." Seidel v. 18 E. 17th St. Owners, Inc., 598 N.E.2d 7, 9 (N.Y. 1992). Courts in this District have thus been reluctant to invalidate choice-of-law clauses in commercial contracts in order to enforce New York's usury laws. See, e.g., Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc., 587 F. Supp. 557, 560 (S.D.N.Y. 1982)

(declining to find the application of Illinois law, which exempts corporations from the protection of its usury law, "violative of public policy, since usury is not a favored defense, particularly in the circumstances here where a corporation rather than a helpless consumer is involved"); RMP Capital Corp. v. Bam Brokerage, Inc., 21 F. Supp. 3d 173, 186 (E.D.N.Y. 2014) (rejecting the argument that the court should apply New York law to the issue of a party's usury defense notwithstanding an Illinois choice of law provision, noting that "such an argument is contrary to previous rulings by courts in this Circuit"); Bentley v. Providian Fin. Corp., No. 02 Civ. 5714 (WHP) (FM), 2003 WL 22234700, at *3 (S.D.N.Y. Apr. 21, 2003) (rejecting plaintiff's argument that the interest rate on his credit card violated New York's criminal usury statute on the grounds that the credit card agreement was governed by New Hampshire law, which has no such usury statute).

Further, it is hardly clear that New York has a "material interest" in affording a Nevada corporation with no connection to New York the protection of New York's criminal usury laws. Nor is the Court persuaded that the connections between the transaction and New York -- all of which stem from the *lender* maintaining its principal place of business in New York -- are sufficiently

substantial for the application of Nevada law "to threaten [New York's] public policy," Cooney, 612 N.E.2d at 284.[18]

In short, the Court cannot conclude that enforcing the parties' choice-of-law provision would be "truly obnoxious" to New York public policy. Edwards, 17 N.Y.3d at 331. To the contrary, rewriting the parties' choice of law -- for the benefit of a corporation that expressly agreed "to resist . . . tak[ing] the benefit or advantage of, usury laws wherever enacted," ECF No. 41-1 at EMA000504, no less -- would undermine New York's interest in promoting certainty and predictability in commercial contracting. See 159 MP Corp. v. Redbridge Bedford, LLC, 33 N.Y.3d 353, 359-60 (N.Y. 2019) ("By disfavoring judicial upending of the balance struck at the conclusion of the parties' negotiations, our public policy in favor of freedom of contract both promotes certainty and predictability and respects the autonomy of commercial parties in ordering their own business arrangements.").

---

[18] Defendant cites several cases involving corporate borrowers in support of its argument that criminal usury is a "fundamental public policy" of New York that must be enforced. ECF No. 68 at 6. None of these cases is directly on point. In Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc., for example, the Court concluded that notwithstanding New York's public policy against usury, it still "[could] not conclude the application of the parties' choice-of-law clause would violate New York's fundamental public policy because based on the record before the Court, New York does not have a materially greater interest in this dispute than Virginia." 2019 WL 1322621, at *5. In In re McCorhill Pub., Inc., 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988), the Court made a single reference to New York's "strong public policy against interest rates which exceed 25%, which policy must be enforced," but ultimately applied New York law on an unrelated basis.

Having concluded that the parties' choice-of-law must be enforced and thus that Nevada usury law governs the transaction, defendant's usury defense fails as a matter of law. Accordingly, plaintiff's motion for summary judgment dismissing defendant's usury defense is granted, and defendant's motion for summary judgment as to its usury defense is denied.

\*       \*       \*

For the avoidance of doubt, even if the Court had concluded that it was appropriate to disregard the parties' Nevada choice-of-law provisions and apply New York law in their stead, defendant's usury defense still would fail insofar as it relies on defendant's contention that the value of the Warrant Agreements "must be ascertained and added to the interest rate." ECF No. 66 at 24. Specifically, NFusz maintains that "[b]ecause [the December and January Warrants] were given as consideration for the loan and because the warrants had value on the date they were conveyed to EMA, they should be considered as part of NFusz' total cost for the loan, i.e., interest." Id. at 22. To the contrary, the Second Circuit has expressly rejected the argument that the value of stock purchase warrants delivered to a lender as additional consideration for a loan is in all instances to be factored into the interest rate analysis. See Chassman v. Shipley, 695 F. App'x 630, 633 (2d Cir. 2017) (summary order) (where parties agreed that, in addition to paying a ten percent per annum interest rate on a

loan, the borrower would also deliver stock warrants to the lender as an "additional inducement" for making the loan, the assignment of warrants did not constitute a payment of interest); see also Phlo Corp. v. Stevens, No. 00 Civ. 3619 (DC), 2001 WL 1313387, at *5 (S.D.N.Y. Oct. 25, 2001), aff'd, 62 F. App'x 377 (2d Cir. 2003) (rejecting the argument that the value of cashless warrants rendered the interest rate on a promissory note usurious where, inter alia, "it was not clear that any effective interest rate in excess of 25% would ever have to be paid, as the value of the warrants was uncertain").[19]

Instructive to this analysis is the consensus in this District that the value of conversion discounts should not factor into the usury analysis. In a slew of recent holdings, see supra at 1 n.1, Courts in this District have uniformly held that in transactions in which the lender has the option to convert the outstanding balance on a promissory note into shares of the borrower's common

---

[19] NFusz relies on Sabella v. Scantek Med., Inc., 2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009) and Hillair Capital Inv., L.P. v. Integrated Freight Corp., 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013) in support of its argument that "the value of securities given to a lender in consideration for a loan must be added to the interest-rate calculation." ECF No. 66 at 22. Sabella and Hillair are distinguishable, however, because they involved the transfer of common stock shares that, unlike the warrant shares at issue here, had a fixed and certain value on the date of delivery. (As noted supra at 2 n.2, warrant shares do not represent immediate ownership of common stock but merely the option to purchase shares of common stock at a fixed price in the future.) While NFusz notes correctly that the common stock shares at issue in Hillair were restricted (i.e., subject to a six-month holding period such that they could not immediately be resold), warrant shares are distinctly uncertain from a valuation standpoint given the possibility that they will remain out of the money until expiration and thus yield no value to the holder.

stock in lieu of monetary repayment, the value of the conversion discount is not to be included in the interest rate calculation for purposes of determining whether the transaction is usurious. See, e.g., Adar Bays, LLC v. Aim Expl., Inc., 285 F. Supp. 3d 698, 703 (S.D.N.Y. 2018) (rejecting the argument that the right to convert loan principal into shares at a fixed discount should be considered as interest in a usury calculation); Blue Citi, LLC v. 5Barz Int'l Inc., 338 F. Supp. 3d 326, 335 (S.D.N.Y. 2018) (same), aff'd, No. 18-3044-CV, 2020 WL 1043452 (2d Cir. Mar. 4, 2020); Union Capital LLC v. Vape Holdings Inc., No. 16 Civ. 1343 (RJS), 2017 WL 1406278, at *5 (S.D.N.Y. Mar. 31, 2017) (same). These rulings are instructive insofar as they rely for their reasoning on features of conversion discounts that are equally applicable in the context of warrant shares -- namely, the uncertainty of profits and the uncertainty of exercisability. See Blue Citi, 338 F. Supp. 3d at 335 ("Interest is, by definition, a payment made with a degree of certainty and regularity; conversion options, by contrast, lack certainty, because they may or may not be exercised and because their value fluctuates depending on the prevailing market price of the shares. Thus a conversion price is not an interest payment and, accordingly, does not fall under the protection of the usury laws"); see also EMA Fin., LLC v. AIM Expl., Inc., No. 18 Civ. 145 (ER), 2019 WL 689237, at *8 (S.D.N.Y. Feb. 19, 2019) ("[T]he case law in this District is uniform in

holding that the value of conversion discounts should not factor into the usury analysis. The reason for this holding is straightforward: The value of the conversion discount simply is too uncertain to include in a usury analysis.").[20]

Here, any profit EMA stands to receive on the exercise of warrant shares depends entirely upon the market price of NFusz common stock at the time the warrant shares are exercised. Further, when the parties entered into the Warrant Agreements, it was uncertain whether it would ever be to EMA's benefit to exercise the warrant shares, given the possibility that the warrant shares would remain out of the money until their expiration dates. In short, warrant shares are of highly uncertain value, and a transaction "is not usurious merely because there is a possibility that the lender will receive more than the legal rate of interest."

---

[20] NFusz maintains that cases concerning the conversion discount "have no bearing on the outcome of this case, which concerns valuation of the warrants (given as up-front consideration for the loan) not valuation of a conversion discount." ECF No. 68 at 23. While NFusz is correct that the exercise of conversion rights is mechanically distinct from exercising warrant shares, there is, if anything, a *more* compelling case to be made for excluding the value of warrant shares from the interest rate analysis than there is for excluding the value of conversion discounts. Indeed, whereas the profits a lender might realize from electing to convert common stock shares at a fixed discount-to-market-price is, at least theoretically, exactly the same no matter the price of the stock (and therefore not actually dependent on the market price of borrower's stock at the time of conversion), the value of warrants turns directly on the borrower's stock price in excess of the warrant's strike price at the time of exercise, rendering the valuation of warrants far less certain. Cf. Adar Bays, 285 F. Supp. 3d at 703 (recognizing that the profits a lender may receive from electing to convert loan principal into shares at a fixed discount "is materially more uncertain than a right to receive cash" given, *inter alia*, the fact that "stock is not necessarily fully liquid and it cannot always be disposed immediately").

Phlo, 2001 WL 1313387, at *4. Accordingly, even if New York rather than Nevada law applied, the Court still would not have concluded, as NFusz urges, that the value of the Warrant Agreements should factor into the usury analysis.

Nor is the Court persuaded by defendant's argument that the December Note would be usurious even *without* factoring the value of the warrant shares into the interest rate analysis. See ECF No. 66 at 15.[21] New York law is clear that a borrower may only raise a defense of criminal usury as a defense to repayment and not, as defendant attempts here, to void a transaction in which the borrower has already repaid the allegedly usurious loan. See Intima-Eighteen, Inc. v. A.H. Schreiber Co., 172 A.D.2d 456, 457–58, 568 N.Y.S.2d 802 (1991) ("The statutory exception for interest exceeding 25 percent per annum is strictly an affirmative defense to an action seeking repayment of a loan and may not, as attempted here, be employed as a means to effect recovery by the corporate borrower") (citations omitted); K9 Bytes, Inc. v. Arch Capital Funding, LLC, 56 Misc. 3d 807, 815, 57 N.Y.S.3d 625, 631 (N.Y. Sup. Ct. 2017) ("It has long been settled in this state that

---

[21] NFusz argues that the combination of (1) the December Note's stated 8% per annum interest rate; (2) the December Note's 10% original issue discount; and (3) the December Note's required weekly repayment provision pushes the effective annual interest rate on the December Note above the 25% criminal usury cap, even without accounting for the valuation of the December Warrant Agreement. See ECF No. 66 at 23-24.

criminal usury may only be asserted as a defense  by a corporation, and never as a means to seek affirmative relief.").[22]

Having concluded that the transactions are not criminally usurious, the Court turns to an analysis of the disputed cashless exercise formula.

## B.    The Cashless Exercise Formula

The parties' cross-motions for summary judgment set forth their respective positions regarding the proper cashless exercise formula.[23]  Whereas EMA urges the Court to declare that the plain-language reading of the formula is appropriate (and thus that EMA was entitled to 7,272,727 shares of NFusz common stock at the time of exercise), NFusz insists that the formula as written is inconsistent with various other provisions within the four corners of the Warrant Agreement and "deviate[s] radically from the industry-recognized definition of cashless exercise."  ECF No. 66 at 26-27.  NFusz maintains that it signed the Warrant Agreements having "overlooked the transposed letters" that resulted in the

---

[22] In light of the foregoing, the Court need not weigh in on the question of whether a finding of criminal usury would, as NFusz contends, render the transactions void ab initio.  See Carlone v. Lion & the Bull Films, Inc., 861 F. Supp. 2d 312, 321 (S.D.N.Y. 2012) ("It is an open question under New York law whether a criminally usurious loan is void ab initio or whether a successful defense based on criminal usury results merely in the cancellation of the interest obligation or in a revised obligation to pay a non-usurious rate.").

[23] Having dismissed NFusz's usury defense, the parties' cross-motions -- i.e., EMA's request for declaratory relief and NFusz's reformation counterclaim -- are, practically speaking, mirror images insofar as they seek to enforce the cashless exercise formula in the manner each party deems proper.  Because the analyses are interwoven, they are considered together herein.

formula's deviation from the industry-recognized standard, and that, due to what NFusz's maintains was an error, the Warrant Agreements must be rescinded or reformed.

As discussed _infra_, the Court finds that the plain-language reading that EMA urges yields results that are both commercially unreasonable and plainly inconsistent with other provisions of the Warrant Agreements. Indeed, analyzed in their entirety, the Agreements reveal that the cashless exercise formula has a particular purpose that can only be reconciled with the version of the cashless exercise formula that NFusz maintains is correct. Because the Court concludes that the cashless exercise formula has only one reasonable interpretation and must be reformed accordingly, EMA's request for declaratory relief is denied and NFusz's counterclaim for reformation is dismissed as moot.

### 1. Principles of Contract Interpretation

"[I]n the absence of ambiguity or other factual complexities, contract interpretation presents a question of law that the district court may decide on summary judgment." Galardi v. Naples Polaris, LLC, 301 P.3d 364, 366 (Nev. 2013) (citing Ellison v. Cal. State Auto. Ass'n, 797 P.2d 975, 977 (Nev. 1990)). "A contract is ambiguous if its terms may reasonably be interpreted in more than one way," Anvui, LLC v. G.L. Dragon, LLC, 163 P.3d 405, 407 (Nev. 2007), but ambiguity does not arise simply because the parties disagree on how to interpret their contract. See

Parman v. Petricciani, 272 P.2d 492, 493–94 (Nev. 1954) (concluding that summary judgment was appropriate because the interpretation offered by one party was unreasonable and, therefore, the contract contained no ambiguity), abrogated on other grounds by Wood v. Safeway, Inc., 121 P.3d 1026 (Nev. 2005). Moreover, under Nevada law, "evidence of trade usage . . . can be used to ascertain or illuminate contract terms." Galardi, 301 P.3d 364 (Nev. 2013).[24]

Finally, "[a] contract should not be construed so as to lead to an absurd result." Nuveda, LLC v. Bady, 404 P.3d 399 (Nev. 2017) (quoting Reno Club, Inc. v. Young Inv. Co., 64 Nev. 312, 325, 182 P.2d 1011, 1017 (1947)). Nor should a contract be interpreted "so as to make meaningless its provisions." Mendenhall v. Tassinari, 403 P.3d 364, 373 (Nev. 2017).

## 2. Competing Interpretations of Cashless Exercise

To determine whether EMA is entitled to the declaration it seeks, the Court looks not only to the plain terms of the cashless

---

[24] Because plaintiff's request for declaratory relief sounds in contract, and because the contracts at issue are governed by Nevada law, see supra at 15-23, the Court applies Nevada law to this issue. See Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 333 (2d Cir. 2005) ("New York courts decide the scope of [contractual choice-of-law] clauses under New York law, not under the law selected by the clause."); Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1540 (2d Cir. 1997) ("[U]nder New York law, a contractual choice of law provision governs . . . cause[s] of action sounding in contract."). As previously noted, § 5(e) of the December Warrant Agreement states that "[a]ll questions concerning the validity, enforcement, and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement." Section 9(a) of the December SPA states, in turn, that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws."

exercise formula but also to the purpose of the cashless exercise mechanism as evidenced by the Warrant Agreements as a whole. In so doing, the Court concludes that the cashless exercise formula that EMA maintains is correct is not only in conflict with other provisions of the Warrant Agreements but also "lead[s] to an absurd result." <u>Reno</u>, 182 P.2d at 1017.

First, the cashless exercise formula as written cannot be reconciled with the provisions of the December Warrant Agreement that describe "cashless exercise" as a method of effectuating payment for NFusz common stock shares.[25] As previously noted, § 2(a) of the Warrant Agreements provides for two mechanisms by which EMA can transmit payment to NFusz for the common stock shares: (1) by "wire transfer or cashier's check" (i.e., with cash or cash equivalents), or (2) by cashless exercise. Consistent with § 2(a), the Notice of Exercise Form that EMA is required to deliver to NFusz in order to exercise its warrant shares requires EMA to designate whether payment for the common stock shares will be made "in lawful money of the United States" (i.e., on a cash basis), or through a "cancellation" of warrant shares. ECF No. 67-4. The Warrant Agreement read in its entirety thus makes clear that the

---

[25] For example, § 2(a) of the Warrant Agreement states that, within three days of EMA having delivered the Notice of Exercise form to NFusz, "[NFusz] shall have received payment of the aggregate Exercise Price of the shares thereby purchased by wire transfer or cashier's check drawn on a United States bank, *unless payment is being made by cashless exercise* as provided in Section 2(c) below." (emphasis added).

function of the cashless exercise formula is to calculate the number of common stock shares owed to EMA after "cancelling" (i.e., deducting) the number of warrant shares necessary to pay the aggregate exercise price of the common stock shares requested.[26] Stated otherwise, instead of paying for the common stock shares on a cash basis for $55,000 (i.e., 500,000 shares multiplied by a $0.11 strike price), the cashless exercise formula (properly construed) permits EMA to transmit the $55,000 by effectively selling back enough shares to make up the strike price.[27]

Because "payment" in the context of cashless exercise takes the form of "cancelled" shares, the cashless exercise mechanism only makes sense if it results in EMA receiving *fewer* common stock shares upon exercising its warrant shares on a cashless basis than

---

[26] When asked at oral argument whether the Court was correct in its understanding that "cashless exercise is not free, but rather an alternative form of payment which involves the cancellation of warrant shares," ECF No. 77 at 5, counsel for EMA responded as follows: "That is correct. [Cashless exercise] involves the cancellation of warrant shares. So if there were 500,000 warrant shares, and you cancelled half, you took 250,000, you would be reduced to 500. So you consume the warrant shares over time, and in that respect, it's not free." ECF No. 77 at 5. This response was, at best, misleading.

It is of course true that when a warrant holder exercises fewer than all of his outstanding warrant shares, the unexercised portion of his warrant shares is correspondingly reduced. (Indeed, the December Warrant Agreement expressly states that "[p]artial exercises of this Warrant resulting in purchases of a portion of the total number of Warrant Shares available hereunder shall have the effect of lowering the outstanding number of Warrant Shares purchased."). ECF No 67-3 at 3. But the "lowering" or "reduction" of outstanding warrant shares plainly is not, as counsel would have the Court believe, the sort of "cancellation" that the cashless exercise mechanism contemplates.

[27] In the instant case, the market price at the time of exercise was $1.71 per share, meaning that it would take 32,164 shares to pay the $55,000 exercise price. ($55,000 divided by $1.71 equals 32,164.) Subtracting 32,164 from 500,000 yields 467,836 shares -- i.e., **precisely the number of shares due under the formula that NFusz maintains is correct.**

it would have been entitled to if it were to have exercised the same number of warrant shares and elected to transmit payment on a cash basis. Whereas NFusz's formula accomplishes this result, EMA's formula does precisely the opposite, entitling EMA to exchange 500,000 warrant shares for *over seven million* shares of NFusz common stock *without any payment whatsoever.* This result is plainly at odds not only with the provisions of the Warrant Agreement that describe "cashless exercise" as an alternative mechanism of *payment*, but also with (1) the provision in the December Warrant Agreement that entitles NFusz to purchase a "*up to* 1,200,000 shares," ECF No. 67-3 at 2 (emphasis added); and (2) the language in the December SPA stating that, as part of the transaction, the "Company shall issue warrants to Buyer to purchase 1,200,000 shares of common stock." ECF No. 51-1 at 2. Awarding EMA the declaratory relief it seeks would therefore require the Court to interpret the Agreements "so as to make meaningless [these] provisions." Mendenhall, 403 P.3d at 373.

Indeed, not only does the cashless exercise formula as written entitle EMA to an exponentially greater number of common stock shares when payment is made on a cashless basis than when payment is made with cash, but the formula as written also entitles EMA to an increasingly greater number of common stock shares as the market price for NFusz common stock increases, without regard to proportionality of ownership. To date, EMA has failed to

articulate a single principled basis for the windfall to which it purports to be entitled.[28]

By contrast, under the formula that NFusz maintains is correct, the number of shares delivered to the warrant holder upon a cashless exercise is always reduced by the cost of exercising those shares. NFusz's formula (unlike EMA's) thus provides for that which the Agreements unambiguously contemplate -- namely, that under a cashless exercise the holder transmits payment for the requested shares in the same amount that the holder could have transmitted via cash. Further, under NFusz's formula, the maximum number of common stock shares purchasable by EMA is the same regardless of whether the warrants are exercised on a cash or cashless basis, and the formula never yields a result that exceeds the 1,200,000 maximum.

---

[28] At oral argument, counsel for EMA made the argument that the cashless exercise formula was designed to give the company "an economic incentive to file a registration statement so there would be no cashless exercise whatsoever," positing further that "[NFusz] could take [the cashless exercise] right away simply by filing a registration statement." ECF No. 77 at 6. But even assuming, *arguendo*, that immediately following the transaction's closing date NFusz had filed a registration statement with respect to the shares of common stock underlying EMA's warrants, there would have been no guarantee that the registration would have been effective prior to the time in which EMA sought to exercise the 500,000 shares on a cashless basis. In such a scenario, the purported "incentive" clearly would not have served its purpose.

In any event, the Agreements -- which presumably could have required NFusz to file a registration statement with the SEC within a stated period of time -- offer no indication whatsoever that the parties intended for such an incentive to operate. To the contrary, the SPAs state only that "[t]he Company will obtain and, so long as the Purchaser owns any of the Securities, maintain the listing and trading of its Common Stock on the OTCBB, and OTCQB, or OTC Pink or any equivalent replacement exchange, the NASDAQ Stock Market ("NASDAQ"), the New York Stock Exchange ("NYSE"), or the NYSE MKT." ECF No. 51-1 at 8.

Moreover, as noted previously, Nevada law permits "evidence of trade usage . . . [to] be used to ascertain or illuminate contract terms," Galardi, 301 P.3d at 364. Here, NFusz has presented uncontroverted evidence of an industry standard for "cashless exercise" that clearly supports its own interpretation. See ECF No. 66 at 27. Rather than rebut NFusz's argument that the formula as written "deviate[s] radically from the industry-recognized definition of cashless exercise," ECF No. 66 at 26-27, EMA states only that "parties [to a contract] may chose [sic] a different approach," ECF No. 60 at 29, and cites two SEC filings reflecting transactions with other companies in which EMA claims to have used the same cashless exercise formula at issue here. Remarkably, however, one of the two SEC filings includes the formula that NFusz maintains is the "industry standard" version. See ECF No. 64-5 at 10.

The Court need not even consider NFusz's arguments regarding the "industry standard" formula, however, because the Agreements viewed in their entirety reveal that the cashless exercise formula is intended to operate in precisely the manner that NFusz's formula

contemplates.[29]  Indeed, because the formula cannot reasonably be interpreted in any other manner, the Court concludes as a matter of law that NFusz's position regarding the cashless exercise formula is the correct one, and that the Agreements must be enforced accordingly.

## IV.  Conclusion

For the reasons stated herein, the Court grants EMA's motion for partial summary judgment dismissing NFusz's usury defense and denies NFusz's cross-motion for summary judgment on its usury defense.  Further, the Court denies EMA's motion for a declaratory judgment finding that the only reasonable reading of the cashless exercise formula is the one advanced by NFusz and reforms the formula accordingly.  Based on these rulings, NFusz's alternative requests for relief are dismissed as moot.

---

[29] Mathematically, NFusz's formula can be understood as follows:  Dividing $800,000 (i.e., the value of the numerator in both formulas using the agreed upon inputs) by "A" (i.e., the market price of $1.71), yields the number of shares of common stock that EMA would be able to purchase using the profits obtained by exercising 500,000 warrant shares at an exercise price of $0.11. Stated otherwise, were NFusz to purchase 500,000 shares of NFusz common stock in the open market, it would spend $855,000 (i.e., 500,000 shares multiplied by $1.71 per share).  Pursuant to the terms of the Warrant Agreement, however, NFusz is entitled to purchase shares at a discounted price of $0.11, such that 500,000 NFusz common stock shares are purchasable from EMA at a price of only $55,000 (i.e., 500,000 shares multiplied by $0.11 per share).  By spending only $55,000 on the 500,000 shares, instead of $855,000, EMA yields a total profit of $800,000 (i.e., $855,000 minus $55,000).  Dividing the $800,000 profit by $1.71 converts the total profit into the number of shares of NFusz common stock that EMA would be able to purchase at the market price using the profits earned via the exercise of its warrant shares, without any cash changing hands—-here, $800,000 divided by $1.71, which yields 467,836 shares.

The parties are instructed to file a joint letter to the Court within 21 days outlining their proposals for future proceedings, and the Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 58 and 63.

**SO ORDERED.**

Dated:    New York, New York
           March /6 , 2020

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE