UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
EMA FINANCIAL, LLC,

                Plaintiff, Counterclaim
                Defendant,

        - against -

NFUSZ, INC.,

                Defendant, Counterclaim
                Plaintiff.
----------------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 3634 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     This litigation, between lender EMA Financial, LLC ("EMA" or "plaintiff") and borrower NFusz, Inc. ("NFusz" or "defendant"), concerns two substantially similar transactions whereby EMA made a loan to NFusz in exchange for (1) a one-year note bearing interest convertible into shares of NFusz common stock, and (2) a warrant agreement granting EMA a five-year option to purchase shares of NFusz common stock at a fixed price (the "exercise price").  Both transactions consist of a Securities Purchase Agreement (the "SPAs"), a Convertible Promissory Note (the "Notes"), and a Stock Purchase Warrant (the "Warrant Agreements"), (collectively, the "Agreements").

     In April 2018, after NFusz repaid the Notes in full, EMA initiated this action to enforce its right under the Warrant Agreements to certain shares of NFusz common stock pursuant to the "cashless exercise" procedure.

1

Now before the Court are EMA's motion for summary judgment on damages and NFusz's motion for leave to amend its answer and counterclaims.  By its proposed amendment, NFusz seeks to add a counterclaim for rescission of the Agreements under Section 29(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act" or "the Act"), 15 U.S.C. § 78cc, for violations of the broker-dealer provisions set forth in Section 15(a) of the Act, 15 U.S.C. § 78o(a)(1).

## I.   **Background**[1]

We assume familiarity with the underlying facts and procedural history and provide here only those facts that are pertinent to resolution of the instant motions.

As noted earlier, central to the dispute are two transactions entered between the parties in December 2017 and January 2018.  On December 5, 2017, EMA and NFusz entered into a SPA (the "December SPA") pursuant to which NFusz issued to EMA (i) an 8% convertible

---

[1] The following facts are drawn from Plaintiff's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 59); the Declaration of Thomas J. Fleming in Support of EMA's Motion for Partial Summary Judgment and the exhibits annexed thereto (ECF No. 61); the Declaration of Felicia Preston in Support of EMA's Motion for Partial Summary Judgment and the exhibits annexed thereto (ECF No. 64); Defendant NFusz's Rule 56.1 Statement of Material Facts Not in Dispute (ECF No. 65); the Affirmation of Marjorie Santelli in Support of NFusz's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 67); the Declaration of Felicia Preston in Support of EMA's Opposition to NFusz's Motion for Preliminary Injunction and Cross-Motion for Preliminary Injunction and exhibits annexed thereto (ECF No. 41); Plaintiff's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 93); the Declaration of Felicia Preston in Support of EMA's Motion for Summary Judgment (ECF No. 95) and the exhibits annexed thereto; the Affirmation of Marjorie Santelli in Support of NFusz's Opposition to EMA's Motion for Summary Judgment (ECF No. 109) and the exhibits annexed thereto; and Defendant NFusz's Response to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts (ECF No. 110).

note in the original principal amount of $185,000 (the "December Note"), and (ii) 1,200,000 warrant shares for NFusz common stock (the "December Warrant Agreement") exercisable at $0.11 per warrant share.  ECF No. 74 ¶ 23.  On January 11, 2018, the parties entered into a substantially similar SPA (the "January SPA") whereby NFusz issued to EMA (i) an 8% convertible note in the original principal amount of $75,000 (the "January Note"), and (ii) 500,000 warrant shares for NFusz common stock (the "January Warrant Agreement") exercisable at $0.14 per warrant share.[2]  Id. ¶ 25.

Shortly after the borrowings, on March 12, 2018, NFusz repaid both the December and January Notes in full, without any stock transfer, in the amounts of $226,573.81 and $87,251.92, respectively.  ECF Nos. 51-3 at 2; 59 ¶ 28.  At that time, EMA had not attempted to exercise any of the warrant shares underlying the December and January Warrant Agreements, which were set to expire in December 2022 and January 2023, respectively.

The Warrant Agreements set forth the procedure for exercising the warrant shares.  EMA is required to deliver to NFusz an executed version of the Notice of Exercise Form that is annexed to the Warrant Agreements.  See ECF No. 4-1 at 13-14.  The Notice of

---

[2] On December 5, 2017, NFusz's common stock closed at $0.096 ($0.014 less than the exercise price of $0.11).  On January 11, 2018, NFusz's common stock closed at $0.097 ($0.043 less than the strike price of $0.14).  See ECF Nos. 70 ¶ 8; 59 ¶ 8.  The warrant shares were thus "out of the money" at issuance (i.e., it would have been economically detrimental to exercise them).

Exercise Form includes a requirement that EMA designate whether payment for the common stock shares will be made "in lawful money of the United States" (i.e., with cash or cash equivalents) or pursuant to the cashless exercise procedure set forth in the Warrant Agreements.  Id. at 12.  The Notice of Exercise Form explicitly refers to the cashless exercise formula set forth in Section 2(c) of the Warrant Agreements.  As written, the cashless exercise formula was to reflect the exercise price subtracted from the market price, multiplied by the number of warrant shares being exercised, and then divided by the exercise price.  Id. § 2(c).

On March 28, 2018, EMA delivered to NFusz a Notice of Exercise Form indicating its intent to exercise, on a cashless basis, 500,000 of the 1.2 million warrant shares underlying the December Warrant Agreement (the "March Exercise Notice").[3]  See ECF No. 4-3.  At the time EMA sought to exercise the 500,000 warrant shares, NFusz common stock was trading at $1.71.  Applying the $1.71 market price and the $0.11 exercise price to the cashless exercise formula as written in the December Warrant Agreement, EMA calculated that

---

[3] According to Section 2(c) of the Warrant Agreements, EMA could use the cashless exercise formula as long as NFusz had not "registered for resale [the common stock] with the Securities and Exchange Commission under an effective registration statement with a current prospectus."  ECF No. 4-1 § 2(c).  The parties do not dispute that when EMA delivered its Notice of Exercise on March 28, 2018, NFusz had not registered its common stock.  Accordingly, EMA had the right to a cashless exercise.

it was entitled 7,272,727 shares of NFusz common stock.[4]  This calculation does not appear on the Notice of Exercise Form.

In response to the March Exercise Notice, on March 29, 2018, Roy Cutaia, on behalf of NFusz, informed EMA that the cashless exercise formula as written in the December Warrant Agreement was clearly an error — the denominator should have been the market price rather than the exercise price — and that NFusz would not permit its transfer agent to deliver the requested number of shares.  See ECF No. 109-1.  According to NFusz, the cashless exercise formula had no sensible application unless the denominator reflected the market price.  Using NFusz's inputs, EMA would be entitled to 467,836 shares of NFusz common stock.  On April 2, 2018, John Scholz, on behalf of EMA, insisted that EMA had properly calculated the number of shares in accordance with the terms of the December Warrant Agreement.  Id.  On both April 4, 2018 and April 5, 2018, Mr. Scholz inquired about the status of the exercise.  Id.  On April 5, 2018, Mr. Cutaia replied, reiterating that there must be a mistake in the cashless exercise formula as written.  Id.  Mr. Cutaia also stated that NFusz would be "happy to accommodate" EMA and that EMA could "exercise the

---

[4] EMA arrived at the 7,272,727 figure using the formula as written in the Warrant Agreements:  ($1.71-$0.11)(500,000)/($0.11) = 7,272,727 common stock shares.

warrant on a cashless basis in accordance [sic] the industry recognized practice." Id.  Mr. Cutaia continued:

> If you intend to insist on your preposterous position, we will seek judicial intervention for reformation of the warrant as it's not something we knowingly agreed to and it's inconceivable to me that an experienced pro like Felicia Preston would have intended this interpretation of the warrant exercise.

Id.  On April 7, 2018, Jamie Beitler responded on behalf of EMA. She stated that the formula as written in the Warrant Agreements was correct and further wrote:

> While we do not desire to escalate this matter any further, if it is necessary to proceed with litigation we will vigorously enforce the terms of the Warrants as agreed upon.  That being said we endeavor to keep the lines of communication open to hopefully resolve this matter without costly litigation.  To that end, I have copied our counsel Peter Weisman on this email exchange […]; please reach out to him directly at your earliest convenience.

Id.  Later that day, Mr. Cutaia responded, with Ms. Beitler, Mr. Scholz, and Mr. Weisman, among others, copied.  Mr. Cutaia stated, again, that NFusz would "accommodate" EMA's exercise of the warrant in accordance with industry standard.  Id.  "Otherwise," he wrote, "we'll pursue reformation."  Id.  For ease of reference, the above-described email thread from March 29, 2018 through April 7, 2018 will be referred to as the "December Warrant Communications."

II.  **Procedural History**

On April 24, 2018, EMA filed the operative complaint, seeking monetary and injunctive relief for breach of the December Warrant Agreement and a declaration that the March Exercise Notice was valid and correctly applied the cashless exercise formula.  In its answer, NFusz alleged counterclaims for fraud in the inducement and reformation or rescission on the basis of mistake.  NFusz also sought the recovery of "all amounts previously paid under the notes representing overcharges of interest" and the voiding of the two transactions pursuant to its affirmative defense of criminal usury.  See ECF No. 19.

On December 20, 2018, while discovery was ongoing, EMA attempted, once again, to gain delivery of the requested 7,272,727 shares of NFusz common stock pursuant to the then-disputed cashless exercise formula by approaching the transfer agent directly.  This prompted NFusz to file a proposed Order to Show Cause seeking a preliminary injunction and a temporary restraining order ("TRO") to enjoin EMA from attempting to exercise the Warrant Agreements pending resolution of this proceeding.[5]

On February 1, 2019, following the close of discovery, EMA opposed NFusz's motion for a preliminary injunction and cross-

---

[5] The Court denied the TRO on the grounds that NFusz could simply instruct its transfer agent to refuse to honor EMA's requests as NFusz had done previously.

moved for a preliminary injunction seeking a declaration concerning the validity of the Warrant Agreements and an order directing NFusz to immediately deliver at least 467,836 shares of common stock pursuant to the formula advanced by NFusz.  ECF No. 40 at 18.  On May 30, 2019, following oral argument on the parties' preliminary injunction motions, the Court granted the parties leave to brief cross-motions for summary judgment.

EMA then moved for partial summary judgment under Federal Rule of Civil Procedure 56, seeking a declaration that the March Exercise Notice "was valid and correctly applied the cashless exercise formula in the Warrants."  ECF No. 60 at 17.  NFusz cross-moved for summary judgment on its affirmative defense of usury or, in the event that the Court determined that Nevada law applied and that its usury defense was unavailable, rescission of the Warrant Agreements or reformation of the cashless exercise formula on the basis of unilateral mistake.  See ECF No. 66 at 9.  The Court held oral argument on the parties' cross-motions on December 5, 2019.

On March 16, 2020, this Court resolved the parties' cross-motions for partial summary judgment.  The Court "grant[ed] EMA's motion for partial summary judgment dismissing NFusz's usury defense and denie[d] NFusz's cross-motion for summary judgment on its usury defense.  Further, the Court denie[d] EMA's motion for a declaratory judgment" and found "that the only reasonable reading of the cashless exercise formula is the one advanced by NFusz and

reform[ed] the formula accordingly." See ECF No. 79 at 37.  Using the reformed formula, the March Exercise Notice would have entitled EMA to 467,836 shares of NFusz common stock.  Id. at 33.

Now, using the reformed cashless exercise formula, EMA moves for summary judgment on damages.  EMA argues that it is entitled to damages because (a) NFusz breached the December Warrant Agreement when it failed to deliver shares pursuant to the March Exercise Notice on April 3, 2018 ("March Exercise Notice Shares"), and (b) NFusz repudiated the December and January Warrant Agreements.  With respect to damages, EMA also argues that it is entitled to prejudgment interest pursuant to Nevada law.  EMA further argues that the December Warrant Communications constituted settlement offers that are inadmissible pursuant to FRE 408.

Separately, relying solely on cases brought by the SEC, which NFusz suggests reflect new law, NFusz moves for leave to amend its answer and counterclaims, ECF No. 19, to add a counterclaim for rescission of the Agreements under Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc, for violations of the broker-dealer provisions set forth in Section 15(a) of the Act, 15 U.S.C. § 78o(a)(1).  NFusz's motion to amend is based primarily on the case SEC v. River North Equity LLC, 415 F. Supp. 3d 853 (N.D. Ill. 2019), which set forth factors to define a "dealer" under the Act. As an additional basis for its motion to amend, NFusz also

references two complaints filed by the SEC in 2020 — Complaint, SEC v. John D. Fierro, et al., No. 20 Civ. 2104 (D.N.J. Feb. 26, 2020) and Complaint, SEC v. Justin Keener, d/b/a JMJ Financial, No. 20 Civ. 21254 (S.D. Fla. March 24, 2020) — which EMA suggests employ the factors set forth in <u>River North</u> to challenge alleged unregistered dealers.[6]

To date, NFusz has not delivered any shares to EMA.

**III.  <u>Discussion</u>**

This Memorandum and Order proceeds as follows.  The Court first addresses EMA's motion for summary judgment, which it grants with respect to the March Exercise Notice Shares and denies with respect to EMA's repudiation claim.  The Court then addresses NFusz's motion to amend, which the Court denies on the basis that NFusz has not shown "good cause" to amend under Federal Rule of Civil Procedure 16(b).

**A. Summary Judgment**

EMA moves for summary judgment, seeking damages based on the cashless exercise formula that the Court previously reformed.

---

[6] When NFusz filed its letter seeking a pre-motion conference regarding its proposed motion for leave to amend, neither <u>Fierro</u> nor <u>Keener</u> had been decided.  Three days before NFusz filed its motion for leave to amend, the Southern District of Florida issued an order denying the defendant's motion to dismiss in <u>Keener</u>.  <u>See</u> <u>Sec. & Exch. Comm'n v. Keener</u>, No. 20 Civ. 21254, 2020 WL 4736205, at *1 (S.D. Fla. Aug. 14, 2020).  NFusz did not mention this decision in its memorandum in support of its motion for leave to amend, ECF No. 104, but did reference the decision in its reply, ECF No. 111.  In its reply, NFusz argued that EMA's business model is "nearly identical to the one described in <u>Keener</u>," and that "the recent SEC prosecutions and court rulings on this question indicate a distinct development in the law that was not present before the deadlines noted in the Court's scheduling order."  ECF No. 111 at 12.

First, EMA seeks monetary damages resulting from NFusz's failure to deliver shares following the March Exercise Notice.[7]  Second, on the theory that NFusz repudiated both the December and January Warrant Agreements, EMA seeks monetary damages reflecting the value of the outstanding warrant shares available under the December and January Warrant Agreements ("Outstanding Warrant Shares") on April 24, 2018 (when this case was filed), or in the alternative, on April 3, 2018 (when EMA says NFusz chose not to deliver the March Exercise Notice Shares).[8]  EMA seeks this second category of damages even though EMA did not deliver any additional Notices of Exercise to NFusz following the March Exercise Notice. EMA also seeks prejudgment interest on the above damages pursuant to Nevada law.[9]  Further, EMA argues that the Court may not consider the December Warrant Communications in resolving the substantive issues that it raises on summary judgment.

---

[7] EMA explains, and NFusz does not dispute, that NFusz at some point effectuated a 15:1 reverse stock split.  ECF No. 94 at 7.  However, for ease of analysis and consistency with its earlier Memorandum and Order, ECF. No. 79, this Memorandum and Order uses pre-split adjusted numbers for the Warrant Agreements throughout its Discussion.  Accordingly, the numbers set forth in the following analysis do not reflect the 15:1 reverse stock split which the parties used in their recent submissions.

[8] The Outstanding Warrant Shares consist of 500,000 shares pursuant to the January Warrant Agreement and the remaining 700,000 shares of the December Warrant Agreement.  These amounts reflect the outstanding number of shares available under the January and December Warrant Agreements.  They do not reflect the number of shares that NFusz would have delivered had EMA exercised the Warrant Agreements pursuant to the reformed cashless exercise formula, which would have reduced the number of shares that EMA received.

[9] The Warrant Agreements at issue are interpreted in accordance with Nevada law, consistent with the Court's choice of law analysis in its Memorandum and Order.  ECF No. 79, at 15-24.

### 1. Legal Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted) (quoting Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)). A factual dispute is genuine if a reasonable factfinder could decide in the nonmoving party's favor. Id.

At summary judgment, a court must resolve all ambiguities and draw all justifiable inferences in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). If it does so, then there is no issue for trial unless the party opposing summary judgment presents "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

## 2. Analysis

### i. December Warrant Communications

As a threshold issue, the parties dispute the admissibility of the December Warrant Communications, a series of email communications among business personnel at the companies between March and April 2018 regarding the March Exercise Notice.  In this email chain, the parties took different positions as to the number of shares to which EMA was entitled based on its March Exercise Notice.  Those different positions became the basis of this lawsuit.  Ultimately, NFusz's position was adopted by the Court. See ECF No. 79.

Federal Rule of Evidence 408 "bars the admission of statements and conduct made in the course of compromise negotiations." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 909 (2d Cir. 1997) (internal quotations omitted).  "[W]here a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408."  Sheng v. M&T Bank Corp., 848 F.3d 78, 84-85 (2d Cir. 2017) (internal quotations omitted).  "The party seeking admission of an offer under those circumstances must demonstrate convincingly that the offer was not an attempt to compromise the claim."  Pierce v. F.R. Tripler & Co., 955 F.2d 820, 827 (2d Cir. 1992).

The December Warrant Communications cannot in any way be construed as "attempt[s] to compromise the claim." Pierce, 955 F.2d at 827. They are prelitigation emails between business personnel attempting to resolve a business conflict. EMA's effort to recast the December Warrant Communications as excludable Rule 408 negotiations is an obvious attempt to eliminate evidence that undermines its position on this motion. As is clear from the face of the December Warrant Communications, Mr. Cutaia does not alter his position throughout the exchange; instead, he consistently offers to accommodate the March Exercise Notice in accordance with the reformed version of the formula. Most tellingly, in his final communication Mr. Cutaia explicitly states, "I'm not going to compromise . . ." ECF No. 109-1. It is thus clear from the language of the December Warrant Communications that the chain does not constitute a compromise negotiation that should be excluded under FRE 408.[10]   See L-3 Commc'ns Corp. v. OSI Sys., Inc., No. 02 Civ. 9144, 2006 WL 988143, at *6 (S.D.N.Y. Apr. 13, 2006) (denying motion to exclude testimony discussing defendant's CEO's request for a breakup fee from plaintiff's counsel during negotiations); see also Int'l Bus. Machines Corp. v. BGC Partners, Inc., No. 10 Civ. 128, 2013 WL 1775437, at *9 (S.D.N.Y. Apr. 25,

---

[10] EMA's reliance on Sheng, 848 F.3d at 82-85, is unavailing. There, the employer offered to reinstate its former employee after counsel agreed that their discussions were governed by Rule 408 and after another settlement offer was communicated.

2013) (finding that "proposal made in the midst of a business communication" should not be excluded under Rule 408).

In any event, evidence of a settlement agreement "can fall outside [Rule 408] if it is offered for 'another purpose,' i.e., for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989) (quoting Fed. R. Evid. 408). Here, even if, arguendo, the December Warrant Communications did contain a compromise, they would fall outside of the purview of Rule 408. NFusz does not seek to use the December Warrant Communications to "prove or disprove . . . the amount of a disputed claim," Fed. R. Evid. 408, but rather to defend against EMA's repudiation claim. The Second Circuit has found that using evidence of negotiations to prove an unrelated claim suffices as "another purpose" under Rule 408. See, e.g., Starter Corp. v. Converse, Inc., 170 F.3d 286, 294 (2d Cir. 1999) (upholding appellee's introduction of settlement agreement and negotiations to prove claims of contractual and equitable estoppel).

Because the December Warrant Communications do not propose a compromise and are being used to disprove EMA's repudiation claim, the Court may rely on the December Warrant Communications in the analysis that follows.

### ii. March Exercise Notice Shares

EMA contends that it is entitled to damages reflecting the value of 467,836 shares of NFusz common stock, which is the amount of stock that EMA would have received pursuant to the March Exercise Notice had it used the reformed cashless exercise formula. EMA maintains that the March Exercise Notice was valid notwithstanding the erroneous calculation, particularly because the March Exercise Notice did not state the number of shares to be delivered.  EMA also states that it is entitled to statutory prejudgment interest pursuant to NPS 99.040.  See Nev. Rev. Stat. Ann. § 99.040 (West).

NFusz argues that EMA is not entitled to the value of the March Exercise Notice Shares because the March Exercise Notice did not, as it must, strictly comply with the terms and conditions of acceptance set forth by the issuer.  NFusz argues that the March Exercise Notice did not strictly comply with the terms and conditions of acceptance because it referenced the erroneous cashless exercise formula.  Moreover, NFusz argues that when EMA calculated the number of shares to which it claimed entitlement, it failed to deduct shares representing the payment amount required under the cashless exercise formula.[11]  Separately, NFusz argues

---

[11] We agree that EMA's demand for shares without any form of payment is inconsistent with the contract as a whole.  EMA's demand for 7,272,727 shares did not account for the structure of the contract, which required payment regardless of the method of exercise.  The fact that the Warrant Agreement as

that even if EMA were entitled to damages pursuant to the March Exercise Notice, EMA's valuation of the March Exercise Notice Shares is incorrect.  According to NFusz, the March Exercise Notice Shares would have been subject to a six-month restriction period pursuant to SEC Rule 144 and Section 2(e)(i) of the December Warrant Agreement.  Thus, if any shares were owed pursuant to the March Exercise Notice, they must be valued on September 28, 2018, six months after the March Exercise Notice was delivered.

### 1. Strict Compliance

NFusz's argument relies on the proposition that "an option must be unequivocally accepted according to its terms in order to constitute a legal and binding acceptance." Finnell v. Bromberg, 381 P.2d 221, 225 (Nev. 1963).  "Exact compliance with an option contract's terms is stringently enforced." Prologis NA3 NV II, LLC v. IGT, Inc., No. 11 Civ. 00346, 2014 WL 321126, at *7 (D. Nev. Jan. 29, 2014) (citing Cummings v. Bullock, 367 F.2d 182, 186 (9th Cir. 1966)).  However, a warrant is not invalidated when the exercising party does not calculate the exercise price accurately before exercising the warrant.  See Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc., 641 F. App'x 24, 26 (2d Cir. 2016).

---

a whole required payment was one of the reasons that we reformed the Warrant Agreement.  See ECF No. 79.

Appended to its complaint, EMA provided a copy of the March Exercise Notice.  See ECF No. 4-3.  There is no dispute that the March Exercise Notice is in "strict compliance" with the December Warrant Agreement's terms.  On the March Exercise Notice, EMA indicated that it elected to exercise 500,000 shares in accordance with the cashless exercise formula and filled out each of the blank spaces appropriately.  Id.

Still, NFusz argues that the March Exercise Notice is invalid because it is based on the erroneous cashless exercise formula. The Court will not accept NFusz's attempt to invalidate the March Exercise Notice by unjustifiably conflating the parties' competing interpretations of the cashless exercise formula with the actual language of the March Exercise Notice.  As an initial matter, the March Exercise Notice does not itself set forth the cashless exercise formula or the number of shares due pursuant to the cashless exercise formula; the March Exercise Notice only references the cashless exercise formula set forth in Section 2(c) of the December Warrant Agreement.  Moreover, this Court has already reformed Section 2(c), meaning that the March Exercise Notice references the proper cashless exercise formula.  See ECF No. 79.

NFusz's argument that the March Exercise Notice is defective because EMA would not have delivered payment, as is required by Section 2(e)(i) of the December Warrant Agreement, is similarly

18

unavailing.   Here, again, NFusz attempts to confuse the March Exercise Notice with the cashless exercise formula.   The fundamental flaw in NFusz's argument is that the formula (whether as written or as reformed) does not appear anywhere on the March Exercise Notice.   Construing the March Exercise Notice to reference the <u>reformed</u> cashless exercise formula in Section 2(c), EMA would have delivered payment by virtue of checking the Cashless Exercise Box.   <u>See</u> ECF No. 79 at 32-33 ("the function of the cashless exercise formula is to calculate the number of common stock shares owed to EMA after 'cancelling' (i.e., deducting) the number of warrant shares necessary to pay the aggregate exercise price of the common stock shares requested").

NFusz's strict compliance argument is its latest attempt to avoid fulfilling the terms of the December Warrant Agreement. Throughout this lawsuit, the parties disputed the proper cashless exercise formula until NFusz prevailed when the Court reformed the December Warrant Agreement.   ECF No. 79 at 37.   Nevertheless, even though in the December Warrant Communications NFusz acknowledged that EMA was entitled to 467,836 shares under the December Warrant Agreement as now reformed, NFusz is now arguing that EMA — the party who followed the contract as signed — should get nothing. ECF No. 109-1.   NFusz's position can only be described as, "heads I win, tails you lose."

Accordingly, there was nothing defective about the March Exercise Notice even though the parties asserted different positions on the proper construction of the cashless exercise provision of the December Warrant Agreement.[12]

### 2. Damages

In cases involving a breach of contract or a defendant's failure to deliver stock, the stock should be valued as of the date of the breach. Whittington v. House of Brussels Chocolates, Inc., No. A482600, 2006 WL 6372322, ¶ 101 (Nev. Dist. Ct. June 05, 2006) (citing Finnell, 381 P.2d at 229). Where, as here, "the purchase price has not been paid, the measure of damages is ordinarily the difference, if any, between the contract price and the market value of the stock at the time when and where it should have been delivered, together with interest thereon from the time of the breach." Id. The market value of the stock on the date of breach is to be calculated as "the mean between the highest and lowest quoted selling prices on that day." United States v. Cartwright, 411 U.S. 546, 551 (1973); see also Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc., No. 13 Civ. 3860, 2014 WL 2800752, at *1 (S.D.N.Y. June 17, 2014), aff'd, 641 F. App'x 24 (2d Cir. 2016). Further, pursuant

---

[12] The Court notes that Section 2(e)(i) of the December Warrant Agreement also provides for liquidated damages. ECF No. 4-1. EMA sought liquidated damages in its Third Cause of Action, ECF No. 4 ¶¶ 24-26, but makes no attempt to recover such damages in the present motion for summary judgment. Accordingly, the Court treats this claim as abandoned.

to NRS 99.040(1), a party that succeeds on a breach of contract claim is entitled to prejudgment interest. Nev. Rev. Stat. Ann. § 99.040 (West); see also Schoepe v. Pac. Silver Corp., 893 P.2d 388, 390 (Nev. 1995) ("interest is recoverable as a matter of right upon money due from contracts").

According to the December Warrant Agreement, NFusz should have delivered to EMA the March Exercise Notice Shares within three trading days of the delivery of the March Exercise Notice, i.e., April 3, 2018. See ECF No. 4-1 § 2(e)(i). EMA thus bases its damages calculation upon the share price as of April 3, 2018. NFusz disputes the use of April 3, 2018 for valuation, arguing that the stock at issue would have been subject to a six-month restriction period pursuant to the December Warrant Agreement and SEC Rule 144. On this basis, NFusz argues that the March Exercise Notice Shares should be valued as of September 28, 2018, i.e., six months after the March Exercise Noticed was delivered.[13]

NFusz's reliance on the six-month holding period in Rule 144, 17 C.F.R. 230.144(d)(1)(i), of the Securities Exchange Act is misplaced. Instead, 17 C.F.R. 230.144(d)(3)(ii) — the so-called

---

[13] As EMA explains, the size of a discount applied to a security to reflect a restriction on its transferability is "a question of fact that depends on the nature of both the issuer and the restrictions, and is typically informed by expert testimony." Jamil v. Solar Power Inc., 230 F. Supp. 3d 271, 275 (S.D.N.Y. 2017), aff'd, 713 F. App'x 42 (2d Cir. 2017). Here, NFusz offers an alternative valuation, see ECF No. 108 at 15, but it is tangled in unresolved questions regarding the volume of available shares on September 28, 2018. In any event, for the reasons set forth below, the Court need not address this question of fact here.

"tacking" provision — applies.  See Campbell v. Liberty Transfer Co., No. 02 Civ. 3084, 2006 WL 3751529, at *14 (E.D.N.Y. Dec. 19, 2006); see also Phlo v. Stevens, 62 F. App'x 377, 382-83 (2d Cir. 2003) (discussing tacking in the context of the conversion of warrants for common stock in a cashless transaction); Hansen Natural Corp. / Unipac Corp., SEC No-Action Letter, 1993 WL 87869 (March 23, 1993) ("The Division has indicated the general position that a security holder may 'tack' through the 'cashless exercise' of warrants or options in determining the holding period for the securities . . . received upon such exercise.").  Because the December Warrant Agreement is a security that is convertible into other securities, i.e., common shares of NFusz, the holding period runs from the issuance of the December Warrant Agreement, i.e., December 5, 2017, with any common shares "tacking" to the date of issue of the December Warrant Agreement.  On this basis, the holding period runs from December 5, 2017 until June 5, 2018.

In its reply brief, EMA states that in the interest of avoiding trial, it is "prepared to accept the date that the shares would have been free trading as a basis to calculate damages,"

i.e., June 6, 2018.[14]  ECF No. 113 at 10.[15]  On June 6, 2018, the mid-point between the high and low stock price was $12.495 per share.[16]  See Cartwright, 411 U.S. at 551; see also ECF No. 95-5. EMA is thus entitled to damages reflecting the value of the March Exercise Notice Shares, calculated using the reformed cashless exercise formula and the NFusz common stock value on June 6, 2018. EMA, moreover, is entitled to prejudgment interest pursuant to NRS 99.040 beginning on April 3, 2018, the date of the breach. Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP, No. 05 Civ. 877, 2012 WL 13106384, at *3 (D. Nev. Mar. 6, 2012), aff'd, 567 F. App'x 527 (9th Cir. 2014) (citing NRS 99.040(1)) (prejudgment interest to run from date money becomes due).[17]

### iii. Outstanding Warrant Shares

EMA claims that it is also entitled to damages for the Outstanding Warrant Shares, i.e., the NFusz common stock it would have received after exercising the December and January Warrant

---

[14] Because of this concession by EMA, the Court does not express an opinion on (i) the appropriate discount to be applied based on the restricted transferability of the stock, or (ii) whether damages should be calculated based on the stock price on the date of alleged intended delivery, i.e., April 3, 2018, or on the first day on which the stock was free trading, i.e., June 6, 2018.

[15] In its Memorandum in Support of its Motion to Amend, NFusz appears to concede that EMA could have sold its shares prior to September 28, 2018, writing that the shares would have been restricted until June 8, 2020.  ECF No. 104 at 9.

[16] Since the 15:1 reverse stock split took place prior to June 6, 2018, the judgment must be calculated to reflect the reverse stock split.

[17] NFusz does not dispute EMA's entitlement to statutory prejudgment interest.

Agreements in their entirety if NFusz had not repudiated the Warrant Agreements.  EMA argues that damages should reflect the value of NFusz common stock on April 24, 2018 (when this case was filed) or, in the alternative, on April 3, 2018 (three days after EMA exercised the March Exercise Notice with respect to 500,000 shares of the December Warrant Agreement).  EMA asserts that Count I of its Amended Complaint sets forth this repudiation claim.  As evidence to support its claim, EMA points to NFusz's (a) refusal to honor the March Exercise Notice and (b) assertion of a usury defense.

NFusz disputes EMA's position on multiple grounds.  First, NFusz maintains that EMA never pled repudiation of both Warrant Agreements in their entirety in the Amended Complaint.  Instead, NFusz asserts that in Count I, EMA's allegations were limited to NFusz's failure to deliver shares pursuant to the March Exercise Notice.  Second, NFusz argues that even if EMA had properly pled repudiation, its claim would fail on the merits because NFusz did not repudiate the Warrant Agreements.  Moreover, NFusz argues that EMA did not demonstrate that it was "ready, willing, and able" to deliver Notices of Exercise with respect to the Outstanding Warrant Shares.

There are several flaws in EMA's motion.  First, EMA did not plead repudiation in its complaint.  Second, even if EMA had pled

a repudiation claim, there is no factual support for its claim in the record.

### 1. Adequate Pleadings

EMA never pled a repudiation claim.  It is axiomatic that an unpled claim cannot be the predicate for a summary judgment motion.

EMA's first cause of action is titled "Failure to Deliver Shares – Relief Sought: Money Damages."   The cause of action states:

> 14. Plaintiff repeats the allegations in paragraphs 1 to 13 above.
> 15. On March 28, 2018, EMA submitted proper notice of exercise under the December Warrant.  Pursuant to the March Exercise Notice, [NFusz] was obligated to deliver to EMA at least 7,272,727 shares.
> 16. Despite its obligation to do so, [NFusz] has failed and refused to deliver the required number of shares of stock to EMA.
> 17. Defendant's conduct has blocked Plaintiff from exercising its rights under the Warrants.
> 18. As a result of [NFusz's] breach of contract, EMA has suffered damages in an amount to be determined at trial, but now estimated to exceed $10,000,000.

ECF No. 4 at 5.

That EMA did not plead repudiation is clear for four reasons. First, the term "repudiation" is conspicuously absent from the title of the claim.  Actually, the title of the claim makes the nature of EMA's claim eminently clear: EMA sought damages for NFusz's failure to <u>deliver</u> shares, and without EMA delivering subsequent Notices of Exercise, there was nothing beyond the March

Exercise Notice Shares for NFusz to deliver.  Second, "repudiation" is nowhere mentioned within the body of the cause of the action. EMA attempts to fasten its repudiation claim to paragraph 17, where EMA alleges that NFusz's conduct "blocked" EMA from exercising its rights under the Warrant Agreements.  But "blocked" is not a synonym for "repudiate."  See Block, Merriam-Webster Thesaurus (listing synonyms of "block," e.g., interdict, intercept, obstruct).  Third, as is clear from the face of the complaint, the allegations themselves are specific to EMA's single attempted exercise via the March Exercise Notice on March 28, 2018.  See ECF No. 4 ¶ 15.  EMA makes no reference to any other attempted exercise of either Warrant Agreement.  Fourth and finally, as is clear from paragraph 11 of the Amended Complaint, EMA alleged that NFusz's conduct blocked its exercise of the Warrant Agreements pursuant to an entirely different theory: that the December Warrant Agreement set forth a limitation on ownership, and until NFusz delivered shares pursuant to the March Exercise Notice, EMA could not "exercise its rights under the Warrants to receive more shares." ECF No. 4 ¶ 11.[18]

Thus, the Amended Complaint does not anywhere allege that NFusz repudiated, refused to honor, or otherwise anticipatorily

---

[18] Section 2(d) of the Warrant Agreements set forth a limitation on ownership restriction, such that EMA could not exercise the Warrant Agreements if doing so would provide EMA with over 4.9% of NFusz's outstanding common stock.

breached the Warrant Agreements.[19]  Because "plaintiff's factual allegations must be enough to give the defendant fair notice of what the claim is and the grounds upon which it rests[,]" EMA has failed to adequately plead this claim.  Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 n.3 (2007)).  Therefore, having failed to plead a cause of action for repudiation, EMA's motion for summary judgment predicated on such a claim is rejected.  Erchonia Corp. v. Bissoon, No. 07 Civ. 8696, 2011 WL 3904600, at *5 (S.D.N.Y. Aug. 26, 2011), aff'd, 458 F. App'x 58 (2d Cir. 2012) (party's argument at summary judgment that it "is entitled to relief under a claim based on alternate factual grounds not raised in its complaint is untimely").

## 2. Merits

Despite the fact that EMA never delivered a Notice of Exercise after the March Exercise Notice — a failure that EMA justifies on the basis that NFusz repudiated the December and January Warrant Agreements — EMA now seeks damages for the Outstanding Warrant Shares.  But even if EMA had adequately pled its claim for damages with respect to the Outstanding Warrant Shares, this Court would deny EMA's motion for summary judgment because there is no factual

---

[19] In fact, it was only EMA's insistence upon receiving 7,272,727 shares pursuant to the March Exercise Notice that would have prevented its exercise of additional warrant shares.  Had EMA accepted the 467,836 shares that NFusz offered, the ownership limitations in Section 2(d) of the December Warrant Agreement would not have been affected.

support for its motion in the complaint or in EMA's Rule 56.1 Statement filed with its Motion for Summary Judgment. <u>See</u> ECF Nos. 4, 93. EMA has not offered undisputed facts to conclude that (a) NFusz repudiated the Warrant Agreements, or (b) EMA was ready, willing, and able to deliver Notices of Exercise to obtain the Outstanding Warrant Shares.

Under Nevada law, a party can be said to have anticipatorily breached a contract where the party demonstrated "a definite unequivocal and absolute intent not to perform a substantial portion of the contract." <u>Kahle v. Kostiner</u>, 455 P.2d 42, 44 (Nev. 1969). "Once a party anticipatorily repudiates the contract, the other party is excused from performing thereunder and is entitled to damages." <u>BZ Clarity Tent Sub LLC v. Ross Mollison Int'l Pty, Ltd.</u>, No. 15 Civ. 1065, 2016 WL 3536620, at *3 (D. Nev. June 28, 2016); <u>Finnell</u>, 381 P.2d at 228. Still, the party suing for anticipatory breach "must present evidence sufficient to satisfy a jury that, but for [the defendant's] breach, [the plaintiff] was ready, willing and able to perform as required by the contract." <u>Republic Waste Indus., Inc. v. G.I. Indus.</u>, No. 93-56390, 1995 WL 124340, at *2 (9th Cir. 1995). If the plaintiff fails to carry this burden, the Court must determine that "any damage [plaintiff] suffered was proximately caused by its own inability to perform rather than the defendant's breach." <u>Id.</u>

Here, the record makes clear that NFusz did not repudiate the Warrant Agreements.  As described above, the December Warrant Communications — which tellingly EMA sought to exclude — are replete with references to NFusz's willingness to deliver the March Exercise Notice Shares in accordance with NFusz's construction of the cashless exercise formula.  ECF No. 109-1.  Three weeks after the final December Warrant Communication on April 7, 2018, EMA filed this lawsuit.  EMA has not provided evidence of any interim communications, let alone any evidence demonstrating NFusz's blanket repudiation of the Warrant Agreements.

In fact, it appears that the entire basis for EMA's assertion of repudiation lies in a single sentence of its Rule 56.1 Statement, ECF No. 93, which is both disputed and obviously incorrect.  In paragraph 12 of its Rule 56.1 Statement, EMA states that since April 3, 2018,[20] "defendant has taken the position that EMA is not entitled to any shares under the Warrants."  NFusz of course disputes this, see ECF No. 110 ¶ 12, on the basis that NFusz offered in the December Warrant Communications more than once to deliver the correct number of shares pursuant to the March Exercise Notice.  The December Warrant Communications hardly demonstrate "a

---

[20] The Court assumes that the reference to April 3, 2020 was in error.

definite unequivocal and absolute intent" not to honor the Warrant Agreements.  <u>Kahle</u>, 455 P.2d at 44.[21]

Also, NFusz points out (and EMA does not contest) that EMA does not cite to any additional Notices of Exercise that it delivered in an effort to obtain the Outstanding Warrant Shares. EMA was thus not "ready, willing, and able" to exercise the Outstanding Warrant Shares.  Nothing about the pendency of this lawsuit prevented EMA from staking out its position by filing additional Notices of Exercise.  But EMA's resubmission of the March Exercise Notice in December 2018 said nothing of the Outstanding Warrant Shares, and EMA has not introduced, for example, any draft Notices of Exercise or communications exhibiting its intent to exercise additional Notices of Exercise.

Finally, EMA's reliance on NFusz's in-litigation assertion of usury as an affirmative defense is not the equivalent of repudiation in the course of the parties' business dealings. Because EMA has not proven that (a) NFusz repudiated the Warrant Agreements, or (b) it was ready, willing, and able to deliver Notices of Exercise to obtain the Outstanding Warrant Shares,

---

[21] EMA's reliance on <u>Finnell</u>, 381 P.2d at 221, is inapposite. There, the optionor explicitly informed the optionee that she was "not going to deliver the stock." <u>Id.</u> at 217. EMA's reliance on <u>Hermanowski v. Acton Corp.</u>, 580 F. Supp. 140, 144 (E.D.N.Y. 1983), is similarly unavailing. There, in two letters, defendant "clearly communicated to the plaintiff the defendant's intention not to perform its obligations under the agreement." <u>Id.</u>  Here, by contrast, EMA does not point to any evidence of NFusz's overt refusal to honor its exercise of the Warrant Agreements.

summary judgment on this point — if properly before the Court — would be denied.

### B. Motion to Amend

Nearly two years after this suit was initiated, NFusz seeks to amend its answer and counterclaims in light of recent caselaw — SEC v. River North Equity LLC, 415 F. Supp. 3d 853 (N.D. Ill. 2019) — and two SEC civil actions — SEC v. Fierro, et al., No. 20 Civ. 02014 (D.N.J. Feb. 26, 2020) and SEC v. Keener, 20 Civ. 21254 (S.D. Fla. Mar. 24, 2020). River North, issued on December 4, 2019, set forth factors to define "dealer" under Section 15(a) of the Securities Exchange Act.

On May 27, 2020, NFusz informed the Court that it sought to add a counterclaim for rescission of the Agreements under Section 29(b) of the Act, 15 U.S.C. § 78cc, for violations of the broker-dealer provisions in Section 15(a) of the Act, 15 U.S.C. § 78o(a)(1). NFusz argues that River North crystallized factors that define EMA as a dealer, as opposed to a trader. According to NFusz, if EMA is a dealer, then EMA should have registered as such with the SEC, and its failure to do so necessitates rescission of the Agreements. Notably, NFusz does not point to any injury it suffered or even suggest that EMA acted as a dealer in the transaction with NFusz. See Tr. of Oral Argument, Dec. 3, 2020, 7:10-8:8; 26:13-23.

31

As an initial matter, EMA disputes the timeliness of the motion to amend.   EMA contends that NFusz's proposed amendment would violate Federal Rule of Civil Procedure 16(b) because the Case Management Order stated that the parties could not amend the pleadings after September 28, 2018.   ECF No. 28 ¶ 4.   EMA also maintains that the amendment would be futile because EMA could not have been a dealer under the December and January Notes and Warrant Agreements.   According to EMA, because the structure of the Notes did not enable EMA to acquire common stock and EMA never acquired stock under the Warrant Agreements, EMA could not possibly have resold the securities in a manner that would qualify EMA as a dealer.

### 1. Legal Standard

Here, NFusz's proposed amendment would require the Court to modify its scheduling order.   Accordingly, in addition to Federal Rule of Civil Procedure 15(a), Federal Rule of Civil Procedure 16(b) applies.   Federal Rule of Civil Procedure 15(a) says that "[t]he court should freely give leave when justice so requires." However, "[a] district court has discretion to deny leave for good reasons, including futility, bad faith, undue delay, or undue prejudice to the opposing party."   McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).   Federal Rule of Civil Procedure 16(b) provides that "[a] schedule may be modified only for good cause and with the judge's consent."   Fed. R. Civ. P.

16(b)(4).   Where the moving party has failed to establish good cause, a court may deny the motion.   Moreover, "a finding of 'good cause' depends on the diligence of the moving party."   Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000); see also Premier Comp Sols., LLC v. UPMC, 970 F.3d 316, 319 (3d Cir. 2020) ("whether 'good cause' exists under Rule 16(b)(4) depends in part on a [party]'s diligence").   "In other words, the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met."   SEC v. Rio Tinto plc, 17 Civ. 7994, 2020 WL 2504008, at *7 (S.D.N.Y. Mar. 9, 2020); see also Parker, 204 F.3d at 340.   In addition to considering whether the moving party has shown good cause, "[t]he district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice [the other party]."   Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 244 (2d Cir. 2007).

### 2. Timeliness

The Court denies NFusz's motion to amend its answer and counterclaims because NFusz's motion was unduly delayed.   As above, the Court in River North issued its decision on December 4, 2019. At that time, the parties were awaiting this Court's decision on their cross-motions for partial summary judgment.   On March 16, 2020, this Court issued its Memorandum and Order on partial summary

judgment.  ECF No. 79.  It was not until over two months later, on May 27, 2020, that NFusz sent a letter to the Court requesting to file a motion for leave to amend.  ECF No. 84.  NFusz attributes this over-two-month delay to undescribed complications arising from the COVID-19 pandemic.

Of course, NFusz could not have moved to amend on the basis of River North (even assuming it would have provided a substantive basis) until after the decision was issued in December 2019, which was well past the deadline for amending pleadings set forth in the Scheduling Order.  ECF No. 28 ¶ 4.  Had NFusz requested leave to amend immediately, this Court as a matter of timing alone might have found that NFusz was "diligent."  Parker, 204 F.3d at 340. Instead, even excusing the two-plus month delay attributed to COVID-19, NFusz waited over three months after the issuance of River North without uttering a word to the Court about its intentions to amend.  This was inexcusable.  Particularly where there is a scheduling order in place and a potentially case-dispositive motion pending, a party cannot hold in its back pocket another potentially case-dispositive motion, waiting to learn the outcome of the pending motion and then presenting seriatim another potentially case-dispositive motion.  This sort of manipulative behavior is unacceptable.  See, e.g., McCarthy, 482 F.3d at 202 (affirming district court's denial of motion for leave to amend where "discovery had closed, defendants had filed for summary

34

judgment, and nearly two years had passed since the filing of the original complaint"); Tardif v. City of New York, No. 13 Civ. 4056, 2016 WL 2343861, at *5 (S.D.N.Y. May 3, 2016) (denying motion to amend because plaintiff was not diligent where plaintiff waited five months between discovering new information and seeking leave to amend); Gullo v. City of New York, 540 F. App'x 45, 47 (2d Cir. 2013) (affirming district court's conclusion that plaintiff's three-month failure to move for amendment after learning new information prevented plaintiff from demonstrating the diligence necessary to satisfy Rule 16(b)).

This is NFusz's second attempt to walk away from the Agreements.  Having failed in its usury defense under New York law when it was incorporated in Nevada, ECF No. 79, NFusz again seeks to avoid compensating EMA for money that it borrowed on its own volition.  Even worse, NFusz argues that "justice requires" that NFusz be permitted to amend its answer because EMA attempted to plead a "newly-minted theory of damages."  ECF No. 104 at 5.  As an initial matter, as above, this Court did not countenance EMA's attempt to shoehorn its new damages theory into old allegations. Nor will it permit NFusz to amend its own pleadings on the basis of a tit-for-tat theory.  Moreover, NFusz is not remotely prejudiced from its inability to amend, particularly where NFusz has not pointed to any harm it suffered because EMA is not a registered dealer.  See Tr. Of Oral Argument, Dec. 3, 2020, 8:3-

35

8. NFusz does not submit, for example, that it purchased stock from EMA or that EMA's resale of NFusz stock damaged NFusz. Far from experiencing prejudice, NFusz is asking the Court to consider an amendment that would provide a windfall to NFusz: having presumably benefitted from borrowing money from EMA, nonetheless NFusz wants to rescind the Agreements in their entirety even though NFusz prevailed on the central issue in the case. ECF No. 79.

Because NFusz has not shown "good cause" for this Court to modify the scheduling order, the motion to amend is denied.

### 3. New Law

Even if, arguendo, NFusz had timely proposed this amendment, the Court would not permit it because the premise that River North is "new law" is flawed. Rather than constituting new law, River North conducts a survey of preexisting law – including case law, statutory definitions, and SEC guidance – and uses those sources to set forth factors that may be considered in determining whether an entity or an individual is a "broker" within the meaning of the Securities Exchange Act of 1934. See 415 F. Supp. 3d at *858 ("But as the [River North] Court stated, these factors (and any decisions construing them) are not controlling. They are neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion."). Collecting cases to amass existing factors is not the same as creating new law. Accordingly, this is not a case where intervening new law justifies an

amendment.  Cf. McGuire v. Warren, 207 F. App'x 34, 37 (2d. Cir. 2006) (permitting amendment to address "change in applicable law" caused by intervening Supreme Court decision).

It follows that the legal sources on which River North relies were equally accessible to NFusz in 2018, when this case was filed. Indeed, even based on cursory research, this Court has identified cases in this Circuit predating this action addressing the term "broker" in the securities law context.  See, e.g., Found. Ventures, LLC v. F2G, LTD., No. 08 Civ. 10066, 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2010) (providing factors to "determine whether a party has acted as a broker" in the context of a Section 15(a) inquiry).

In sum, NFusz has failed to provide any justification for its tardy assertion of its newly-minted counterclaim.  Accordingly, we need not address the merits of the proposed amendment.[22]

---

[22] Even if we allowed the amendment, the Court has serious questions about its merit.  First, NFusz has not identified any provision in the Warrant Agreements that requires EMA to register as a broker.  In this District, such a link is essential.  See, e.g., Slomiak v. Bear Stearns & Co., 597 F. Supp. 676, 682 (S.D.N.Y. 1984) (holding that § 29(b) voids contracts that "in their inception or as performed are, or become, *inherently* violative of the Act or regulations thereunder"); LG Capital Funding, LLC v. ExeLED Holdings, Inc., No. 17 Civ. 4006, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018) (finding that "even if [plaintiff] should have registered, nothing in the Note or the SPA indicates that those contracts 'could not have been legally performed' because [plaintiff] failed to do so."); Ema Fin., LLC v. Vystar Corp., 336 F.R.D. 75, 81 (S.D.N.Y. 2020) ("The flaw in [defendant's] argument, however, is that it does not identify a provision in the contracts that obligates [EMA] to act as a broker-dealer."); Frati v. Saltzstein, No. 10 Civ. 3255, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) ("[t]here is . . . no reason to believe that the contracts themselves could not be legally performed—a fact which is fatal to Plaintiff's claim.").  NFusz's reliance on Fifth Circuit precedents, which are not binding on this Court, is of no assistance to NFusz.  Cf. Eastside Church of Christ, et al., v. National Plan, Inc., et al., 391 F. 2d 357, 362 (5th Cir. 1968); Regional Properties, Inc. v. Financial and Real Estate Consulting Co.,

## IV.  **Conclusion**

For the reasons stated herein, EMA's motion for summary judgment is GRANTED in part and DENIED in part; and NFusz's motion to amend is DENIED.  Within ten days of the date of this Memorandum and Order, EMA is directed to submit a proposed judgment.  EMA's submission must include an affidavit that clearly computes the amounts claimed using the cashless exercise formula as reformed in ECF No. 79.  NFusz may submit an affidavit disputing any of EMA's calculations within ten days of receiving EMA's submission.  The parties are, of course, encouraged to confer and agree on the calculations.

The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 92 and 97.

---

678 F.2d 552 (5th Cir. 1982) (a case not inconsistent with this District's case law).  Thus, the Court is not persuaded by NFusz's argument that entering into the Warrant Agreements themselves required broker registration.  Indeed, at oral argument, NFusz agreed that hypothetically, the judge herself – who is certainly not registered as a broker – could have been the lender in the transaction. Tr. of Oral Argument, Dec. 3, 2020, 7:9-21.  Moreover, as a matter of fact, here, EMA never received any NFusz common stock with which to effect a brokered transaction: NFusz did not provide any stock following the March Exercise Notice and NFusz had repaid the December and January Notes before EMA could have obtained any common stock.

Further, NFusz could not identify any harm it suffered because EMA was not registered.  See Tr. of Oral Argument, Dec. 3, 2020, 8:3-7.  Under these circumstances, if NFusz was permitted to rescind the contracts from which it benefitted, it would simply receive a windfall.  In this respect, it bears noting that the cases on which NFusz predicates its motion to amend – River North, Keener, and Fierro — are all SEC enforcement actions.  Unlike NFusz, the SEC can compel a defendant to register as a broker.  This Court is highly skeptical of NFusz's attempt to "use the threat of a hypothetical SEC action to vitiate contracts that were lawful at the time they were executed." LG Capital Funding, 2018 WL 6547160, at *5.

**SO ORDERED.**

Dated:     New York, New York
           December 22, 2020

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE